**FEDERAL TRADE COMMISSION**
Plaintiff,

v.

**Keith GILL, an individual doing business as the Law Offices of Keith Gill, and Richard Murkey, an individual, Defendant.**

**No. CV98–1436LGBMCX.**

United States District Court,
C.D. California.

Nov. 3, 1999.

John D. Jacobs, Raymond E. McKown, Jennifer Larabee, Los Angeles, CA, for Plaintiff.

Herbert Davis, Herbert Davis Law Offices, Los Angeles, CA, David P. Cwiklo, David P. Cwiklo Law Offices, Woodland-hills, CA, for Defendant.

## ORDER GRANTING FEDERAL TRADE COMMISSION'S MOTION FOR SUMMARY JUDGMENT

BAIRD, District Judge.

### I. INTRODUCTION

Defendants run a service that advertises that it can remove "negative information" from credit reports. The FTC brings the instant suit against defendants under (1) the Credit Repair Organization Act for

defendants' allegedly misleading statements and illegal billing practices and (2) the FTC Act for deceptive practices.

## II. FACTUAL AND PROCEDURAL BACKGROUND

### A. THE PARTIES

Defendant Gill is a licensed attorney who does business as a sole practitioner as the Law Offices of Keith Gill. *See* FTC's Statement of Uncontroverted Facts at 3 ("FTC's Statement").[1] In addition to a general law practice, Gill has offered credit repair services to consumers since 1995. *See id.* Defendant Murkey is a retired attorney. *See id.* at 7. Since 1995, in conjunction with Gill's office, Murkey has offered credit repair services to consumers. *See id.* at 3.[2]

### B. THE REPRESENTATIONS

Through the use of radio broadcasts, ads in various newspapers, and phone conversations and personal meetings, the FTC alleges that defendants "prey on consumers with bad credit histories" by offering them a free initial consultation and then using that consultation to convince consumers that defendants can remove all of the negative information on their credit report. *See* FTC's Mem. P. & A. Sup. Mot. S.J. at 6 ("FTC's Mem.").

Consumers who contact defendants have the option of visiting the office or dealing completely over the phone. *See* FTC's Statement at 4. Consumers who go to the office are asked to bring a copy of their credit report or asked to sign an authorization so that defendants can obtain a copy.

*See id.* Consumers conducting business over the phone either fax a copy of their report, or an authorization form. *See id.*

Gill does not usually participate in the initial consultation, Murkey does. *See id.* Murkey usually uses the consultation to explain the type of service he plans to offer, discusses costs, and discusses the positive results that he has obtained for previous customers. *See* Murkey's Statement of Genuine Issues of Material Facts at 10 ("Murkey's Statement"). According to the FTC, defendants tell consumers that accurate and non-obsolete information can and will be removed from a consumer's report if they retain defendants' service. *See* FTC's Statement at 5. Defendant Murkey, however, states that potential customers are told that defendants "will use [their] best efforts to get negatives removed, and tells [the potential customer] of his prior success in getting different types of negatives removed, including what plaintiff describes as 'accurate non-obsolete' negative information." *See* Murkey's Statement at 11. Defendants also tell their customers that credit reports will begin improving in as little as a month to six weeks. *See* FTC's Statement at 5.

### C. PAYMENT ISSUES

The starting point for the fees charged to consumers is set forth in a fee schedule. *See* FTC's Statement at 5.[3] Consumers are typically given a written estimate of the total costs, with each negative item listed separately. *See id.* at 16. Consumers are then required to make a down-payment and commit to a monthly payment plan for payment of the balance. *See id.*[4] After

---

1. Unless stated otherwise, the facts drawn from the FTC's Statement of Uncontroverted Facts are undisputed by defendants.

2. Murkey disputes that contention and instead argues that they jointly operated a credit repair business. *See* Murkey's Statement of Genuine Issues of Material Facts at 7 (Murkey's Statement). This dispute is irrelevant.

3. The defendants dispute that the fee schedule is the starting point. *See* Murkey's Statement at 35. Rather, they argue that the fee schedule is the maximum charged by defendants

and that the fee charged is always less than the amount shown in the fee schedule. *See id.* This dispute does not negate the fact that defendants use a fee schedule to determine the fees charged to consumers.

4. Defendants, in response to this contention, allege that they perform services before requesting payment. *See* Murkey's Statement at 35. However, this conclusory allegation does not negate the fact that defendants do ask for a down-payment, and do require monthly payments.

consumers make the down payment, defendants bill the consumers on a regular basis. *See id.* at 17.[5] Defendants have continued to bill consumers who had attempted to cancel their contract. *See id.*

## D. PROCEDURAL HISTORY

The FTC filed this complaint on March 2, 1998. The case was originally assigned to Judge Irving Hill. Also on March 2, 1998, the FTC sought an order temporarily placing the case under seal, a temporary restraining order, an asset freeze, an order permitting expedited discovery, and an order to show cause why a preliminary injunction should not be issued. Judge Hill denied the request to place the case under seal, denied plaintiff's request to hear the temporary restraining order without notice to the defendants, and ordered the FTC to serve all the papers filed in the case on defendants.

On March 31, 1998, the case was reassigned to this Court. On April 21, 1998, the FTC, Murkey, and Gill entered into a stipulation as to the preliminary injunction. The parties agreed, *inter alia*, that Murkey and Gill would not represent that anyone can substantially improve most consumer's credit reports or profile by permanently removing bankruptcies, tax liens, late payments, collection accounts, or other evidence of delinquencies from the consumer's credit reports; that they would not violate any provision of the Credit Repair Organization Act, 15 U.S.C. § 1679 *et seq.* by, *inter alia*, charging or receiving money for credit repair services before the services are fully performed, making statements to credit reporting agencies that defendants knew or had reason to believe were untrue or misleading, making or using any untrue or misleading representation of their services; that they would not dissipate any assets in their possession; that they would not dispose of any documents relating to this litigation; that they

would turn over to the FTC a detailed accounting of all funds they have received for credit repair services; that they would maintain a detailed accounting of all the uses and changes in status quo of any assets they own; that they would prepare and turn over to the FTC a financial statement; that they would return to the FTC all payments made by customers not yet cashed or received; and that they would enjoin from exercising any control over any business entity without first giving notice to the FTC. *See* April 21, 1998 Murkey Stip.; April 21, 1998 Gill Stip.

Discovery then proceeded amidst a constant state of battle, culminating in the plaintiff's filing of the instant summary judgment motion on September 3, 1999. On September 14, 1999, defendant Gill filed a brief opposition and joined in Murkey's opposition. On September 15, 1999, defendant Murkey filed his opposition. The FTC filed its reply on September 20, 1999.[6]

## III. STANDARD FOR SUMMARY JUDGMENT

Rule 56 of the Federal Rules of Civil Procedure provides that a court shall grant a motion for summary judgment if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). Material facts are those that may affect the outcome of the case. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. *See id.*

The moving party for summary judgment bears the initial burden of demon-

---

**5.** Defendants again conclusorily argue that the payments are for services rendered. However, they do not challenge that these payments are due on a monthly basis.

**6.** In conjunction with this motion, the parties have filed approximately 5300 pages of exhibits, not including the lodged depositions.

strating the absence of a genuine issue of material fact for trial. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). When the moving party has the burden of proof on an issue at trial, it must affirmatively demonstrate that no reasonable trier of fact would find other than for the moving party. Conversely, on an issue for which the nonmoving party has the burden of proof at trial, the moving party need only point out "that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265.

Where the operative facts are substantially undisputed, and the heart of the controversy is the legal effect of such facts, such a dispute effectively becomes a question of law that can, quite properly, be decided on summary judgment. *See Odle v. Heckler,* 707 F.2d 439, 440 (1983). However, summary judgment should not be granted where contradictory inferences may be drawn from undisputed facts. *See Braxton–Secret v. A.H. Robins Co.,* 769 F.2d 528, 531 (1985). In such a case, the non-moving party must show that the inferences it suggests are reasonable in light of the competing inferences. *See Matsushita Elec. Indus. Co. v. Zenith Radio Co.,* 475 U.S. 574, 588, 106 S.Ct. 1348, 1357, 89 L.Ed.2d 538 (1986).

## IV. ANALYSIS

### A. THE FAIR CREDIT REPORTING ACT

The Fair Credit Reporting Act ("FCR Act") was enacted to assure fair and accurate credit reporting. *See* 15 U.S.C. § 1681(a)(1). The FCR Act regulates the credit reporting industry by limiting the type of information credit reporting agencies ("CRA") may compile, the manner in which it may be reported, and the procedures for ensuring the accuracy of the information. *See id.* § 1681a-c, e, 1. The law permits a CRA to obtain accurate negative information from a review of public records or information that can be provided by a public agency. *See generally, id.* § 1681 *et seq.* Additionally, a CRA is entitled, under certain circumstances, to gather information for the purpose of preparing an investigative consumer report. *See id.* § 1681d.

Generally, a CRA has a duty of reasonable care in the preparation of consumer reports. *See* 21 C.J.S. *Credit Reporting Agencies* § 6, at 358 (1990). Because preparation of a consumer credit report may be viewed as a continuing process, the obligation to ensure accuracy arises with every addition of information. *See id.* But to require an agency to update independently information after receipt and verification would burden commercial dealings beyond any required legislative mandate. *See id.* As such, the statutory duty to maintain accurate information does not require the credit reporting agency to include all the relevant credit information. *See id.* at 359. Furthermore, for a consumer to prevail on a claim under the statute based on the allegation that the report is incomplete, the lack of completeness must be of a fundamental nature. *See id.* n. 20 (citing *Stewart v. Credit Bureau, Inc.,* 734 F.2d 47 (D.C.Cir.1984)).

If a consumer disputes the completeness or accuracy of any item on his or her credit report, the CRA must verify the accuracy of the disputed item or remove it, subject to certain limitations. *See* 15 U.S.C. § 1681i(a)(1)(A). If an item is found to be inaccurate or unverifiable, the CRA must delete the information from the credit report. *See id.* If the entry is verified, and the consumer continues to dispute it, the consumer is entitled to have his side of the dispute included in the record. *See id.* § 1681i(b). There is nothing in the law which precludes the disputed information from being reinstated on a consumer's credit report if the information is found to be accurate and non-obsolete. Indeed, because a CRA is under a mandate to furnish credit reports or profiles which are accurate, the CRA is obligated to reinstate the negative information on

the credit report if found to be accurate and non-obsolete. *See id.* § 1681e(a). Although a CRA has a general obligation to reinvestigate a dispute, the law also permits a CRA to terminate a reinvestigation of information disputed by a consumer if the CRA reasonably determines that the consumer's dispute is frivolous or irrelevant. *See id.* § 1681i(a)(3)(A). The grounds for such a determination include circumstances where the consumer fails to provide sufficient information to investigate the disputed information. *See id.*

## B. THE CREDIT REPAIR ORGANIZATIONS ACT

The Credit Repair Organization Act ("CRO Act") took effect on April 1, 1997. The purpose of the CRO Act is to

ensure that prospective buyers of the services of credit repair organizations are provided with the information necessary to make an informed decision regarding the purchase of such services; and ... to protect the public from unfair or deceptive advertising and business practices by credit repair organizations.

*See id.* § 1679(b).

As of 1997, the FTC is responsible for enforcing the CRO Act which spells out the duties of credit repair organizations. *See* Federal Trade Commission § 19.09, at 48 (Supp.1999). The CRO Act regulates the activities of "credit repair organizations," which are defined as

any person who uses any instrumentality of interstate commerce or the mails to sell, provide, or perform (or represent that such person can or will sell, provide, or perform) any service, in return for the payment of money or other valuable consideration, for the express or implied purpose of (i) improving any consumer's credit record, credit history, or credit rating; or (ii) providing advice or assistance to any consumer with regard to any activity or service described in clause (i) ....

*See* 15 U.S.C. § 1679a(3)(A).

The CRO Act prohibits any credit repair organizations from making any statement to any CRA or any person who has extended credit to the consumer or to whom the consumer has applied for an extension of credit (1) which is untrue or misleading (or which, upon the exercise of reasonable care, should be known by the credit repair organization to be untrue or misleading) with respect to the consumer's creditworthiness, credit standing, or credit capacity, or (2) the intended effect of which is to alter the consumer's identification to prevent the display of the consumer's credit report, credit history, or credit rating for the purpose of concealing adverse information that is accurate and non-obsolete. *See id.* § 1679b(a)(1), (2).

The CRO Act also prohibits credit repair organizations from (1) making or using any untrue or misleading representations of the services of the credit repair organization, or (2) charging or receiving any money or other valuable consideration for the performance of any service which the credit repair organization has agreed to perform for any consumer before such service is fully performed. *See id.* § 1679b(a)(3), (b).

Additionally, credit repair organizations may not provide any services to any consumers until (1) the consumer has signed a written and dated contract for the purchase of such service, and (2) three business days have passed since the date the contract was signed. *See id.* § 1679d(a). The consumer signing such a contract may cancel the contract without penalty or obligation before midnight of the third business day after the date on which the consumer signed the contract. *See id.* § 1679e(a). The contract must contain a conspicuous statement in bold face type informing the consumer of his right to cancel the contract, and must be accompanied by a form that the consumer can use to cancel the contract. *See id.* § 1679d(b)(4). The contract must also contain the credit repair organization's name and business address, the terms and

condition of payment, and a full and detailed description of the services to be performed, including all guarantees of performance and an estimate of the date by which the service will be completed. *See id.* § 1679d(b)(1)-(3). Any contract that does not comply with the CRO Act is void and unenforceable, and the consumer cannot waive any of his or her rights under the statute. *See id.* 1679f(a), (c).

To ensure compliance, the CRO Act provides a right of action by private citizens injured by a credit repair organization, *see id.* § 1679g(a), by states on behalf of their residents, *see id.* § 1679h(c)(1), and by the FTC, *see id.* § 1679h(a). For the purpose of the exercise by the FTC of its functions and powers under the Federal Trade Commission Act ("FTC Act"), any violation of any requirement or prohibition imposed under the CRO Act shall constitute an unfair or deceptive act or practice in commerce in violation of Section 5(a) of the FTC Act. *See id.* § 1679h(b)(1). Thus, all functions and powers of the FTC under the FTC Act are available to the FTC to enforce compliance with the CRO Act, including the power to enforce the provision of the CRO Act as if the violation had been a violation of a trade regulation rule. *See id.* § 1679h(b)(2).

## C. THE FTC ACT

Plaintiff also brings this action under Section 5 of the FTC Act. Section 5 provides that "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce, are hereby declared unlawful." 15 U.S.C. § 45(a)(1). Under Section 5, the Court will find an act or practice deceptive or misleading if there is a representation, that is likely to mislead consumers acting reasonably under the circumstances, and the representation is material. *See FTC v. Pantron I Corp.*, 33 F.3d 1088, 1095 (9th Cir.1994).

---

7. *Pantron* held that, under Section 5 of the FTC Act, a representation is considered deceptive if (1) there is a representation, omission, or practice that (2) is likely to mislead

## D. ALLEGED VIOLATION

Plaintiff alleges that defendants violated (1) section 404(a)(3) of the CRO Act; (2) section 404(b) of the CRO Act, and (3) Section 5 of the FTC Act. The Court addresses the violations of the CRO Act as a matter of first impression.

The moving party for summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact for trial. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). When the moving party has the burden of proof on an issue at trial, it must affirmatively demonstrate that no reasonable trier of fact would find other than for the moving party. As such, it is the FTC's burden to show that the undisputed facts entitle it to a judgment as a matter of law. The Court analyzes the FTC's claims *seriatim.*

### 1. SECTION 404(a)(3) OF THE CRO ACT

Section 404(a)(3) of the CRO Act provides that "[n]o person may ... make or use any untrue or misleading representation of the services of the credit repair organization." 15 U.S.C. § 1679b(a)(3). Plaintiff argues that the elements needed to prove a violation of section 404(a)(3) of the CRO Act are analogous to those needed to prove a violation of Section 5 of the FTC Act prohibiting unfair or deceptive practices. As such, the FTC states that it must show that (1) there is a representation, omission, or practice that is likely to mislead consumers acting reasonably under the circumstances, and (2) the representation, omission, or practice is material. *See* FTC's Mem. at 32. For support, the FTC cites *FTC v. Pantron I Corp.,* 33 F.3d 1088, 1095 (9th Cir.1994). *Pantron I,* however, did not address Section 404 of the CRO.[7]

---

consumers acting reasonably under the circumstances, and (3) the representation, omission, or practice is material. *See FTC v. Pan-*

■ Contrary to Section 5's somewhat amorphous language, section 404(a)(3) of the CRO Act is much more specific and prohibits particular conduct (as opposed to unfair or deceptive acts). Unlike Section 5 of the FTC Act, liability attaches even if the representation made by the credit repair organization is not made "for the purpose of induc[ing]" consumers to purchase a particular service or good. *Compare* 15 U.S.C. § 45(a) *with* 15 U.S.C. § 1679b(a)(3). On the face of the statute, liability attaches for violation of Section 404(a)(3) if the statement made regarding the service of the credit repair organization is untrue or misleading, nothing more or nothing less. As such, the burden on the FTC is to show an "untrue or misleading representation." 15 U.S.C. § 1679b(a)(3).

Plaintiff argues that under this standard, defendants should be held liable as a matter of law because the representations that they made were both untrue and misleading. Defendants, on the other hand, argue that judgment as a matter of law is inappropriate because there remains genuine issues of fact as to (1) whether defendants did in fact improve a substantial number of consumer credit reports by removing negative items from their reports; (2) whether defendants represented that they could permanently remove negative items from consumer credit reports; and (3) whether defendants represented that they could permanently remove all negative items on consumer credit reports. *See* Murkey's Mem. P. & A. Op. S.J. at 14–15 ("Murkey's Mem."). As such, defendants contend that none of the aforementioned issues can be decided by the Court. As the following discussion highlights, defendants err.

Plaintiff argues that defendants should be liable for making untrue or misleading representations based on two grounds.[8] First, plaintiff argues that defendants' representation that they can remove accurate non-obsolete negatives legally is false. Second, plaintiff argues that defendants' representation that they can permanently take negative items off a consumer's credit report is also false.

### a. Untrue Representations

Defendants appeared on a one hour weekly radio broadcast called "Turn Your Life Around" on a local Los Angeles radio station from sometime in 1997 until March of 1998. *See* FTC's Statement at 12–13. Defendants encouraged people who called or visited the office to listen to the program. *See id.* at 13. During the broadcast, Murkey made the following statements:

> "There literally is nothing a consumer can possibly have on a credit report that we cannot remove and we can remove it legally."

> "There [are] many legal ways under the Federal Fair Credit Reporting Act to fix credit, no matter what type of negative it is, including foreclosure and or bankruptcy, judgment, tax liens ... even if those [items] are not paid off."

> "Because of the Federal laws and the consumers' rights under the Federal laws, we still have legal rights as consumers and we can, in fact, knowing the right proper techniques and strategies and procedures that we have perfected in our offices over the years, we can legally remove those negatives from someone' (sic) credit report."

> "It doesn't make a difference what type of negative you have: We have files in our office verifying that we can legally remove bankruptcies, foreclosures, what they call short pays in the real estate community, judgments, tax liens, surrenders, repossessions, defaulted student loans, charge offs, settlements, collections and even late accounts for child support.... It does not make a difference if that item was legally put on

*tron I Corp.,* 33 F.3d 1088, 1095 (9th Cir. 1994).

8. Defendants do not dispute that they are a credit repair organization as defined by statute. *See* Murkey's Statement at 8. Therefore, the provision of the CRO Act apply to them.

there or not and to us it doesn't make a difference if you still owe money."

"When it comes to removing negatives that actually were yours in the first place, you can forget it, they [credit bureaus] aren't going to help you at all. But yet we can, that's where we come in and provide a service to the consumer."

"I'll repeat this again: It doesn't make a difference what kind of negative you have on the report, whether they're paid or unpaid accounts, they can legally be removed from your report."

"No matter what kind of negative you can possibly have, there are legal ways to take those items off your credit report and that can be done even without you paying off that account. Even tax liens or judgments can be removed from your report legally without you having to pay that charge...."

"In our offices, we can clean your credit in six weeks to two months."

FTC's Statement at 13–14. Defendants do not challenge the substance of these broadcasts, but allege that they are taken out of context. *See* Murkey's Statement at 32. The Court fails to see exactly what defendants mean by "out of context." Statements are either made or they are not. In this case, defendants admitted making these statements, and the Court will deem them as undisputed. However, even though the statements are undisputed, plaintiff must show that they are false or misleading.

Plaintiff also points to statements made by defendants at public appearances before mortgage brokers and before a bar association. *See* FTC's Statement at 15. During a presentation to a group of mortgage brokers, Murkey represented that

99.9 percent of the time everything we take off stays off forever. And usually, if something comes back on, it's an open account not a closed account. But we tell our client this, and we put it in writing, if anything comes back on the credit report at all, we'll take it off again for free.... [O]n average of all our clients, at least half the negatives will be gone in the first six weeks period.

*id.* (citing FTC's S.J. Ex. 18 at 1207 ("CAMB Presentation")). At the same public appearance, Murkey told the mortgage brokers that the removal of negative items was done "100 percent legally so [their] clients can sleep at night." *See id.* at 1211.

There are two overarching themes embodied in the radio broadcasts and the public appearances. The first one is that defendants can legally remove all kinds of negative information from consumers' credit reports. The second one is that once the items are removed, they are so removed permanently.[9]

■ Addressing the permanency issue first, the statements made at the CAMB presentation unequivocally claim that everything (or 99.9%) defendants take off consumer credit reports stays off. According to the declarations provided by plaintiff, this is not a true statement. *See* TRO Ex. 3 at 198–99; TRO Ex. 4 at 209–11; S.J. Ex. 1 at; S.J. Ex. 2 at 55–56; S.J. Ex. 3 at 72–74; S.J. Ex. 4 at; S.J. Ex. 10 at 479, 482; S.J. Ex. 12, at 505–10. Defendants do not challenge that at least four of the declarants' negative entries on their credit report were not permanently removed. What they do challenge is that the affidavits proffered by plaintiff repre-

9. Additionally, plaintiff submits evidence that consumers who speak with the defendants over the telephone are regularly told that any and all negative information can be removed from their credit report in a very short time. *See* FTC's Statement at 14. Defendants challenge that assertion and state that no such statements were made. Defendants state that their customers "are told that it is possible to remove all types of negatives, but no guarantee is given that all negatives will be removed." Murkey's Statement at 32. To support that assertion, defendants cite to evidence in the record which shows that he does not give guarantees. *See* Murkey Decl. at 3612, attached to Murkey's Mem. Op. S.J., Ex. 58 ("Murkey Decl."); CAMB Presentation at 3458. As such, the defendants have raised a genuine issue of material fact as to those particular statements only.

sent only a small proportion of defendants' clients. *See* Gill Decl. at 3; Murkey Decl. at 3618. To support that assertion, defendants direct this Court to review exhibits 45 through 56 filed in support of their opposition. However, defendants offer no testimony as to what these documents represent or how these documents could possibly show (1) that they achieved any removal of negative information, (2) that any information removed was accurate, (3) that any such information was not obsolete, (4) that any information, if actually deleted, was not later reinserted, or (5) that the permanent removal of that information was achieved in a lawful manner.[10]

Additionally, defendants emphasize that the FTC had access to over 2,000 files, and yet could only find a very few number of "dissatisfied" customers, who "will make false statements to obtain [a] 'free ride.'" Gill Decl. at 5. The defendants miss the point. Plaintiff does not need to submit a declaration for every single injured customer to meet its burden. If so, this courthouse would be buried under a mountain of paper. The FTC need only offer sufficient evidence to meet its burden at trial. Once it has done so, it is the defendants' task to challenge that showing with sufficient evidence to create a genuine is-

sue of material facts. Other than defendants' self-serving, unsworn, and unsubstantiated statements that they do remove negative items permanently, defendants have provided no admissible evidence to create such a genuine issue here.

Addressing the "legality" of defendants' techniques, the FTC alleges that the defendants' so-called legal methods consist of inundating the credit reporting agencies with dispute letters, sent in the name of consumers, which falsely allege that various items on the credit report are incorrect or that a particular account does not belong to a consumer. *See* FTC's Statement at 10.

The defendants dispute that characterization and state that they "do not intentionally misrepresent any of their client's credit status in their dispute letters to the credit bureaus." Murkey's Statement at 23.[11] Furthermore, defendants allege that they "use various methods to remove negatives in credit reports, other than sending dispute letters to credit reporting agencies." *See id.* Finally, defendants claim that "the letters dispute information which defendants believe is either inaccurate or incomplete." *See id.*

---

**10.** In addition, the exhibits offered by defendants, even if probative, are not admissible under the Federal Rules of Evidence. As plaintiff points out, they lack authentication and they are inadmissible hearsay. At oral argument, Murkey's counsel urged this Court to ignore such deficiencies. Counsel argued that in the name of justice, such a "technicality" should not prevent the Court from considering the substance of the evidence. First, the Court would like to make something very clear: the Federal Rules of Evidence are not mere technicalities—they are federal laws. As such, this Court is obligated to follow their mandate. Second, it is not this Court's responsibility to cure defense counsel's inadequate attempt to introduce evidence. To do so would create an "injustice" to the other party, who has complied with the letter of the law.

**11.** It is interesting to note that it is these kinds of practices which provided the catalyst for Congress's decision to pass the CRO Act. In commenting on an earlier version of the

CRO Act, the House Committee on Banking stated that

> credit repair clinics ... through advertisements and oral representations, lead consumers to believe that adverse information in their consumer reports can be deleted or modified regardless of its accuracy.... Therefore, such representations by credit repair clinics are often misleading, and consumers ... are cheated out of the money they paid for services.... Where credit repair clinics do succeed, however, they often do so through abuse of the reinvestigation procedure.... This title seeks to regulate the industry to ensure that consumers are provided with necessary information about credit repair organizations so that they can make informed decisions regarding the purchase of their services and to protect the public from unfair and deceptive advertising and business practice by the industry.

Consumer Reporting Reform Act Of 1994, H.R. Rep. 103–486.

First, the Court addresses defendants' contention that they "do not intentionally misrepresent any of their client's credit status." Plaintiff provided eleven declarations of consumers who had allegedly been deceived by Murkey's statements, but a few of them are particularly enlightening. John Frye's declaration has, attached to it, approximately 30 letters that were sent on his behalf to the credit reporting agencies (Equifax and Experian) from Murkey.[12] *See* Frye Decl., FTC's S.J. Ex. 3. These letters were sent by Murkey to these agencies without Frye's consent or knowledge. *See id.*[13] As an illustration, the Court quotes some of the statements made by Murkey:

"This is not an account that I have with this company, this is someone else's information entirely!" (Spokane Credit Union; Universal Bank Custo.; Crdt First)

"I have never been late on any of my payments towards this account!!" (Wells Fargo Marine)

"I did not file bankruptcy. This is absurd!"

"I don't owe them any money." (Crdt First)

"I might have some bad credit but this doesn't belong here." (First USA)

"This is not my account." (Sears)

*Id.* at 148–177. John Frye testified that the Sears and the Spokane Teachers Credit Union accounts (which the Murkey letters state did not belong to him) did in fact belong to him, and that he did file for bankruptcy. *See id.* at 79. John Frye further testified that he had told Murkey about this. *See id.* Therefore Murkey knew that the accounts belonged to Frye and that Frye did file bankruptcy.

Another client of defendants provided two letters which were written on her behalf by Murkey.[14] The letters were addressed to Trans Union (another credit reporting agency) and stated that a particular Visa account "was not written off as a loss. This was a good account." *See* Cole Decl., FTC's S.J. Ex. 2 at 70. In regard to a foreclosure, the letter further stated that "this is crazy! This foreclosure is not mine! This false information is causing my family and I great hardship. Could you please investigate this matter and take care of it for us." *Id.* Elsa Cole, Murkey's client in this case, testified that she told Murkey that the foreclosure was hers. *Id.* at 58. Furthermore, she testified that the Visa account was also hers. *See id.* Thus, the representations in the letters were false.

Another client of Murkey and Gill's credit repair clinic, Kimberly Harris, attached six letters to her declaration. Those letters are written to Equifax, Trans Union, and Experian.[15] One of those letters states that the bankruptcy reported on her credit report was done so in error. The letter states "Wow. This is a screw up I never expected to be on my report. Please take this false information off my report immediately! It is not mine." Harris Decl., FTC's S.J. Ex. 4 at 195. The

---

12. In his Statement of Genuine Issues of Material Facts, Murkey "disputes" the declaration of John Frye. *See* Defs.' Statement at 40. However, he points to no evidence which would refute any of Frye's testimony, or render inadmissible any of the documents attached as exhibits to the declaration.

13. All the letters attached to the Frye declaration were sent after the enactment of the CRO Act. The letters are dated June 1997, November 1997, October 1998, and March 1999. *See* FTC's S.J. Ex. 3 at 148–177. As to the letters which were sent after March 1998, these letters are in violation of both the CRO Act and of the preliminary injunction entered in this case.

14. The two letters sent on behalf of Cole are dated February 1998 and March 1999. *See* FTC S.J. Ex. 2 at 70–71. Both letters were written after the enactment of the CRO ACT, and the March 1999 letter is also in violation of the preliminary injunction entered in this case.

15. The letters sent on behalf of Harris are dated December 1997, November 1998, and March 1999. *See* FTC's S.J. Ex. at 195–200. All the letters violate the CRO Act, and all the letters but the December 1997 letters violate the preliminary injunction entered in this case.

other five letters are similar in substance, and essentially deny owning certain accounts. *See id.* at 195–200. However, once again, Mrs. Harris testified that the bankruptcy was hers, and that she told defendant Murkey that it was hers when she met with him. *See id.* at 178. She also told him that the other accounts were hers. *See id.* As such, Murkey's statements on Harris' behalf were false.

■ Contrary to defendants' contention, these kinds of challenges are not legal. Section 404(a)(1) of the CRO Act prohibits any person from making "any statement . . . which is untrue or misleading (or which, upon the exercise of reasonable care, should be known by the credit repair organization . . . to be untrue or misleading) with respect to any consumer's credit worthiness . . . to . . . any consumer reporting agency." Clearly, these statements were untrue. Furthermore, the addressees (Equifax, Trans Union, and Experian) are consumer credit agencies. *See* 15 U.S.C. § 1681a(f). As such, at least one of defendants' practices is not legal, and any representation that it is, is false as a matter of law.

As to the contention that defendants use other legal methods to remove negative items from consumer's credit reports, defendants point to deletion letters which allegedly resulted from negotiations with creditors. *See* Murkey's Statement at 24 (citing to Murkey's Mem., Ex. 37 at 3515–3530). It is unclear how these deletion letters came about—whether they are the result of negotiations with the creditors, whether they are the result of successful removals of negative items based on inaccuracy, whether they are the result of successful removals of negative items based on the fact that they were obsolete, or whether they are the result of defen-

dants' illegal mailing campaigns.[16] Defendants argue, based on these letters, that there remains a genuine issue of fact as to whether defendants can legally remove accurate and non-obsolete information from consumers' credit reports. Even if these letters were admissible and probative, the issue whether these practices are legal is not material. Because at least one of defendants' practices is illegal as a matter of law, their claim that they can remove negative credit information "100% legally" is false. *See* CAMB Presentation. at 1211.[17]

In a last effort to show that their tactics are legal, defendants claim that "the letters [sent on behalf of consumers] dispute information which defendant [s] believe[ ] is either inaccurate or incomplete." Murkey's Statement at 23. First, plaintiff challenges that characterization by pointing to the fact that defendants often do not inquire from the customers whether the information on their credit report is accurate or not, and by pointing to the dispute letters quoted above. *See* FTC's Statement at 11.

Addressing the charge that defendants often do not ask consumers about the information on their credit report, defendants state that they can determine the accuracy or completeness of the reports based on the four corners of the report and need not always ask information from their customers. *See* Murkey Dep. at 237–38, attached to FTC's Mot. S.J., Ex. 16 ("Murkey Dep."). For example, if a customer has a tax lien on his report, and the tax lien originated in Alaska, defendants can tell from the addresses on the credit report if the customer ever lived in Alaska. *See id.* at 239–40. If not, defendants can challenge that entry without any other information from the customer. *See id.* at

---

16. The FTC objects to these letters on the ground that (1) they are inadmissible hearsay, (2) they are not authenticated, and (3) they are irrelevant. The FTC's hearsay objection is well taken. The Christie Declaration fails to support a finding that the letters fall within the business record exception. Furthermore, the letters are not properly authenticated.

17. At oral argument, defense counsel had difficulties articulating which other methods defendants use to repair credit. After consultation with his client and Mr. Gill, counsel was able to identify only two or three other methods. However, there is no evidence anywhere in the record that substantiate these empty allegations.

240. Additionally, defendants state that the amounts of such liens are always inaccurate because the reports never identify whether the amount owed, as reflected on the credit report, is at the time the lien was entered or at the time the report was generated. *See id.* Therefore, defendants argue that they need not talk to their customers to determine that the information on the credit report is incomplete. *See id.* Also, defendants need not talk to the customers to determine whether the negative information is obsolete because the law specifies how long a credit reporting agency may maintain certain entries. *See* 15 U.S.C. § 1681c. This may be true, but as demonstrated by the letters cited above, defendants do more than merely contest the "technical" accuracy of the entries on credit reports. Furthermore, defendants have a duty to exercise reasonable care in making representations to credit reporting agencies. *See* 15 U.S.C. § 1679b(a)(1)(A). Defendants' admissions that they do not ask about the accuracy of the reports violate that duty, and as such violate the law. Furthermore, a brief reading of the letters sent by defendants on behalf of their clients show that defendants' challenges are far outside the "four corners" of the credit reports.

### b. Misleading Representations

Moving away from the minutia of determining whether the statements were actually false as a matter of law, the Court now analyzes the representations made as a whole. There are no reported cases that have laid out the standard a court should use to interpret whether particular representations made by a person were misleading or not. There are, however, cases which addressed the interpretation of advertisements. The Court finds those issues to be similar and analyzes the current representations in light of the standards used by courts in analyzing advertisements. In deciding questions of ad interpretation, the Court looks at the "overall net impression made by the advertisement in determining what message may reasonably be ascribed to it." *FTC v. U.S. Sales Corp.*, 785 F.Supp. 737, 745 (N.D.Ill.1992).

The question then becomes whether plaintiff has affirmatively demonstrated that the representation/advertisement, taken as a whole, was misleading as a matter of law. Even if some of the statements are impliedly misleading, and not expressly so, this is a distinction without a difference. *See FTC v. Figgie Int'l, Inc.*, 994 F.2d 595, 604 (9th Cir.1993). There is nothing in the case law which protects from liability those who merely imply their deceptive claims. *See id.* With that principle in mind, the Court now analyzes defendants' statements.

Defendant Murkey stated in his radio broadcast that there was "literally ... nothing a consumer can possibly have on a credit report that we cannot remove." FTC's Statement at 13. This statement implies that the defendants are able to remove all negative information on consumers' credit report, not just inaccurate and obsolete information. Murkey further stated that there are many legal ways under the Federal Fair Credit Reporting Act to "*fix credit,* no matter what type of negative it is, including foreclosure and or bankruptcy, judgment, tax liens ... even if those [items] are not paid off." *Id.* (emphasis added). Once again, this statement implied that all kinds of negative information can be removed. The rest of the statements in the radio broadcast are similarly misleading. Furthermore, although defendants do not specify that the negative information will be removed permanently, it is implied from the context of the advertisement. The reference to "fixing" credit clearly connotes permanency. *Random House Webster's College Dictionary* defines "fix" as "to place definitively and more or less permanently [or] to settle definitely." *Random House Webster's College Dictionary* 491 (2d ed.1997).

Defendants also placed advertisements in local newspapers stating that they "can and will help" and that "all can be removed." *See* FTC's Statement at 12. Although the Court need not analyze all of the defendants' statements to impose lia-

bility, these statements are also facially deceptive because they indicate that defendants can remove all negative information from consumers' credit report.

■ Defendants claim that they have provided sufficient evidence to show that the statements were not misleading. They point to the disclaimer provided in their contract, the fact that they never guaranteed anything to anyone, and that they never represented that the removal of negative information would be permanent. The Court first addresses the disclaimer issue. First, the disclaimer is not included in the representations. It is found on the contract that consumers eventually sign with the defendant. Therefore, because each representation must stand on its own merit, even if other representations contain accurate, non-deceptive information, that argument fails. *See Removatron Int'l Corp. v. FTC*, 884 F.2d 1489, 1496–97 (1st Cir.1989). Second, a disclaimer does not automatically exonerate deceptive activities. *See In re Rexplore Securities Litigation*, 671 F.Supp. 679, 683–85 (N.D.Cal. 1987).

Addressing the guarantee issue, the Court finds that the lack of guarantee does not negate the misrepresentations. The guarantee issue is a perfect example of what is misleading about these representations because it is implied in the text, yet it is never given. The same analysis applies to the argument that Murkey never represented that any of the negative items would come off permanently.

Looking at all the statements made by defendants, and taking into consideration all the omissions, the defendants have failed to raise a genuine issue of material fact that the representations were not misleading.

## 2. SECTION 404(B) OF THE CRO ACT

Section 404(b) of the CRO Act provides that

[n]o credit repair organization may charge or receive any money or other valuable consideration for the performance of any service which the credit repair organization has agreed to perform for any consumer before such service is fully performed.

15 U.S.C. § 1679b(b). Plaintiff states that when consumers first meet with Murkey, they are given a written estimate of total costs, with each negative item listed separately, and before any services are actually rendered, let alone completed, consumers are required to make a down payment of as much as 50% and commit to a monthly payment plan for payment of the balance. *See* FTC's Statement at 16. In support of this statement, the FTC provides the testimony of numerous declarants.

■ As to the down-payment, defendants do not dispute that they obtain one, but rather, they dispute the size of the down-payment. *See* Murkey Statement at 36. Furthermore, they deny that the down payment represents payment for services not yet rendered. *See id.* Considering that defendants offer a "Free Initial Consultation without any obligation," FTC's Statement at 12, that last denial makes little sense. If the initial consultation is free, yet consumers are required to pay a down-payment at the end of the initial consultation,[18] the money cannot

---

18. In his statement of genuine issues of material fact, Murkey does not deny that he asks for a down-payment at the initial consultation but he does dispute that any payment made by consumers is for services not yet rendered. Counsel for Murkey made a similar argument at the hearing, where he stated that there is often days between the initial consultation and the time at which the down payment is received. As such, defendants argue, the money received is for services which are completed. Defendants, however, point to no evidence which would validate that argument. Counsel's statements are not evidence. Furthermore, defendants' statement that a "[d]own payment is accepted after services are rendered by defendant," Murkey's Statement at 36, without more is not enough to present a genuine issue of material fact. As a matter of fact, all of Murkey's disputes relating to Section 404(b) are unsubstantiated. *See id.* at 37–38. Therefore, as to that issue, he has failed to raise any issue of fact at all.

possibly be for anything which has already been performed.

As to the monthly installments, defendants summarily dispute that the installments are received before any service is completed. *See* Murkey Statement at 35. Murkey somewhat clarifies his position in his declaration, where he states that he does not charge for taking off negative items, but that his charges relate to the services rendered in trying to remove the negative items. *See* Murkey Decl. at 3617. Defendant Murkey alleges that his services consist of analyzing credit reports; planning a strategy as to how to help the consumer remove a negative; making telephone calls; writing letters; reviewing of subsequent credit reports; consultations with clients regarding credit and debt issues; negotiate, dispute and/or request verification of negative item to either credit bureaus, creditors, and/or collection agencies. *See id.* He thus concludes that he does not offer a service which "removes" negative items from consumers' credit reports, and as such argues that he can charge in increments for services allegedly already performed. As such, defendants violated section 404(b) of the CRO Act.

Furthermore, defendants dispute the FTC's interpretation of the statute. Defendants argue that the language in the Act which states that a "credit repair organization may [not] charge ... for the performance of any service ... before such service is fully performed" cannot mean that all negative entries must be removed before any fees can be assessed by the organization. 15 U.S.C. 1679b(b). Defendants allege that to construe the statute as such would render the statute punitive and unconstitutional. The reasoning behind defendants' argument is that if the statute was interpreted as such, and because it may take months to resolve certain types of negative entries on a consumer's credit report, to give such meaning to the statute

would in essence force all credit repair companies out of business due to the practical impossibility of operating such a business for six months without seeing a penny of payment.[19] Instead, defendants urge this Court to interpret the statute so as to allow payment for each interim service rendered by the organization short of actually removing all negative information from a credit report. Because defendants have failed to raise genuine issues of fact to counter the FTC's showing that it is defendants' practice to receive payment before any service has been rendered, and as such violates the statute even as interpreted by the defendants, the Court need not enter into a statutory or constitutional analysis at this point.

## 3. SECTION 5 OF THE FTC ACT

Section 5 of the FTC Act prohibits "unfair or deceptive acts or practices in or affecting commerce." 15 U.S.C. § 45(a)(1). Under Section 5, an act or practice is deceptive or misleading if (1) there is a representation, (2) that is likely to mislead consumers acting reasonably under the circumstances, and (3) the representation is material. *See FTC v. Pantron I Corp.*, 33 F.3d 1088, 1095 (9th Cir. 1994). Defendants do not challenge that there were representations and that the representations were material. As such, the Court only addresses whether the representations were likely to mislead consumers as a matter of law.

In determining whether the representations were likely to mislead, the FTC must show probable deception ("likely to mislead," not "tendency and capacity to mislead"). *See Southwest Sunsites, Inc. v. FTC*, 785 F.2d 1431, 1436 (9th Cir.1986). Also, in cases brought under Section 5 and Section 12 of the FTC (false advertisement), "[a]dvertising capable of being interpreted in a misleading way should be construed against the advertiser." *Resort*

---

19. Interestingly, however, defendants represent to consumers that negative entries may

be removed within a month to six weeks.

*Car Rental Sys., Inc. v. FTC*, 518 F.2d 962, 964 (9th Cir.1975). Failure to disclose material information may cause a representation to be deceptive within the meaning of the FTC Act, even though the representation does not state false facts. *See Simeon Mgmt. Corp. v. FTC*, 579 F.2d 1137, 1145 (9th Cir.1978). Additionally, this Court may examine the representation to determine whether the net impression is such that the representation would be likely to mislead reasonable consumers. *See generally FTC v. Colgate–Palmolive Co.*, 380 U.S. 374, 85 S.Ct. 1035, 13 L.Ed.2d 904 (1965) (meaning of an advertisement may be determined by an examination of the advertisement itself); *Simeon*, 579 F.2d at 1145 (" 'the words 'deceptive practices' set forth a legal standard and they must get their final meaning from judicial construction' " (quoting *Colgate–Palmolive Co.*, 380 U.S. at 385, 85 S.Ct. 1035, 13 L.Ed.2d 904)); *see also FTC v. U.S. Sales Corp.*, 785 F.Supp. 737, 745 (N.D.Ill.1992) (granting summary judgment in favor of the FTC on its Section 5 claim of deceptive advertisement). As such, the Court interprets the instant representations as representing to consumers that the defendants can and will remove all types of accurate and non-obsolete information from consumers' credit reports permanently. Furthermore, the fact that the contracts signed by consumers with defendants did not contain the misrepresentations is immaterial to this inquiry under Section 5. The FTC Act is violated "if it induces the first contact through deception, even if the buyer later becomes fully informed before entering the contract." *Resort Car Rental Sys., Inc.*, 518 F.2d at 964.

■ Adopting the analysis discussed in Section IV.D.1 above, addressing Section 404(a)(3) of the CRO Act, whereby the Court found no genuine issues of material fact as to the false and misleading character of defendants' representations, and concluding that the net impression of those false and misleading representations are likely to mislead reasonable consumers, the Court determines that there is no genuine issue of material fact that the repre-

sentations violate Section 5 of the FTC Act.

### 4. PERSONAL LIABILITY AGAINST INDIVIDUAL DEFENDANTS

■ The FTC argues that both Gill and Murkey are individually liable for both monetary and equitable relief. The defendants do not challenge this contention. Furthermore, the Court finds the argument persuasive. Clearly, based on Murkey's direct misleading representations, Murkey is personally liable as a participant and a primary violator. As to Gill, Murkey stated that both he and Gill jointly operated a credit repair business and that consumers who desired to have their credit report improved signed a retainer agreement with the Law Offices of Keith Gill. *See* Murkey Decl. at 3607; Murkey's Statement at 7. It is unclear as to whether the "business" (Gill's law offices) was a corporation, a partnership, or a sole proprietorship. Using the more stringent standard afforded to corporations—thereby giving the non-moving parties the benefit of the doubt—Gill would still be liable. Once the FTC has established corporate liability, which it has in this case, it must show that the individual defendant participated directly in the practices or acts or had authority to control them. *See FTC v. Amy Travel Service, Inc.*, 875 F.2d 564, 573 (7th Cir.1989). The FTC must then demonstrate that the individual had knowledge. *See id.* The knowledge requirement is satisfied by showing that a defendant had actual knowledge of the material misrepresentations, reckless indifference to the truth or falsity of these misrepresentations, or an awareness of a high probability of fraud coupled with an intentional avoidance of the truth. *See id.* Both Gill and Murkey have testified that they consider every customer who signs a retainer agreement with the Gill law office to be a client of Gill, thereby meeting the knowledge requirement. *See* Gill Dep. at 722, 725–26 attached to FTC's Mot. S.J., Ex. 1 ("Gill Dep."); Murkey Dep. at 828. Fur-

thermore, neither Gill nor Murkey dispute that Gill had knowledge of the representations. Additionally, as the primary signatory to those retainer agreements, Gill had de facto control over the conduct of the parties. As such, Gill is also personally liable.

## 5. REMEDIES

The FTC seeks a permanent injunction against Gill and Murkey, including a provision banning them from conducting or participating in credit repair, a provision requiring payment of consumer redress, and other ancillary relief. Section 13(b) of the FTC Act provides that:

> Whenever the [FTC] has reason to believe ... that any person ... is violating ... any provision of law enforced by the Federal Trade Commission, and ... that the enjoining thereof ... would be in the interest of the public— the Commission ... may bring suit in a district court of the United States to enjoin any such act or practice.

15 U.S.C. § 53(b).

The second proviso of Section 13(b) provides that "in proper cases the Commission may seek, and after proper proof, the court may issue, a permanent injunction." *Id.; see also Pantron I Corp.*, 33 F.3d at 1102; *FTC v. H.N. Singer, Inc.*, 668 F.2d 1107, 1110 (9th Cir.1982). According to plaintiff, defendants' activities, grounded in misrepresentations of material facts in violation of Section 5(a) of the FTC Act and Section 404 of the CRO Act, qualify as a "proper case" for injunctive relief under Section 13(b). *See H.N. Singer*, 668 F.2d at 1111.

That section has been interpreted to authorize this Court to permanently enjoin defendants from violating the FTC Act if there is some cognizable danger of recurring violation. *See United States v. W.T. Grant*, 345 U.S. 629, 633, 73 S.Ct. 894, 898, 97 L.Ed. 1303 (1953); *CFTC v. Co Petro Marketing*, 502 F.Supp. 806, 818 (C.D.Cal. 1980), *aff'd* 680 F.2d 573 (9th Cir.1982). Such a likelihood may involve the consideration of past unlawful conduct. *See Co*

*Petro Mktg.*, 502 F.Supp. at 818. But if the Court draws

> the inference from past violations that future violations may occur, the Court should look at the "'totality of circumstances,' and factors suggesting that the infraction might not have been an isolated occurrence are always relevant." ... [W]hen the violation has been predicated upon systematic wrongdoing, rather than isolated occurrences, a court should be more willing to enjoin future conduct.

*Id.* (quoting *CFTC v. Hunt*, 591 F.2d 1211, 1220 (7th Cir.1979)).

 As demonstrated by the frequency of the misrepresentations (such as the weekly radio broadcast and the advertisements in local newspapers), defendants have exhibited a pattern of misrepresentations which convinces this Court that violations of the CRO Act and of the FTC Act were systematic. As to the possibility of recurrence, defendants have ceased to operate through the law offices of Gill, but currently operate their credit repair business through the auspices of a "non-profit" organization called "Credit Restoration Corporation of America" ("CRCA"). *See* Murkey Dep. at 816. Although Gill claims to be unaffiliated with CRCA in his deposition, documents filed by Murkey with the Internal Revenue Service indicate that Murkey is the President of CRCA as well as a director and Gill is a Director of CRCA. *See* Harris Decl., FTC's S.J. Ex. 14 at 670. Through their new corporation, defendants are still trying to collect from previous customers under their new corporate name, admittedly in violation of the preliminary injunction entered in this case. *See* FTC's S.J. Ex. 1 at 47–53; Ex. 2 at 68–69; Ex. 3 at 143–47; Ex. 4 at 192; Ex. 12 at 523–26. Furthermore, defendants have continuously ignored and violated both the CRO Act and the preliminary injunction in this case. As the evidence demonstrates, defendants continue to send the same false and misleading letters to CRAs. *See* Section IV.D.1. *supra.* As

such, there is a real likelihood of recurring violation.

 The FTC also seeks equitable monetary damages against Murkey and Gill jointly and severally. The FTC argues .that defendants are liable for violations of the CRO Act from its enactment until the present, and that they are liable for violation of the FTC Act from the time they started making misrepresentations about their ability to repair credit.[20] As to defendants' liability under the CRO Act, plaintiff argues that they are liable under Section 409. See 15 U.S.C. § 1679g. Section 409 provides that

> [a]ny person who fails to comply with any provision of this subchapter with respect to any other person shall be liable to such person in the amount equal to the sum of the amounts determined under each of the following paragraphs:
>
> (1) Actual damages
>
> The greater of—
>
> (A) the amount of any actual damage sustained by such person as a result of such failure; or
>
> (B) any amount paid by the person to the credit repair organization.
>
> (2) Punitive damages
>
> . . . . . .
>
> (3) Attorneys' fees

Id. As such, the plain language of the statute does not allow the FTC to recover damages incurred by consumers. The FTC may, however, recover under Section 410. See id. § 1679h. Section 410 provides that "[a]ll functions and powers of the Federal Trade Commission under the Federal Trade Commission Act shall be available to the Commission to enforce

compliance with this subchapter ... as if the violation had been a violation of any Federal Trade Commission trade regulation rule." Id. As such, the FTC's ability to seek equitable monetary remedies lies in its powers under the FTC Act.

The FTC Act does not specifically address equitable monetary relief. See id. However, the Ninth Circuit has held that the power to grant any ancillary relief necessary to accomplish complete justice necessarily includes the power to order restitution. See Pantron I Corp., 33 F.3d at 1102. Plaintiff argues that defendants have operated their credit repair business since January 1995, and therefore seek recovery for all income since the inception of defendants' business. Plaintiff had access to defendants' bank records from January 1, 1995 through August 1998 only. Plaintiff has shown that during that time frame, defendant Murkey has deposited $836,706.30 in various bank accounts. See FTC's S.J. Ex. 17 (bank records). This number is undisputed by defendants. However, plaintiff seeks damages to the present date. To calculate how much money defendants collected from August 8, 1998 to present, plaintiff used defendants' 1998 average monthly income and projected it to the present. Defendants' total deposits for the months of January through August 1998 were $285,260.52, or an average of $35,657.56 per month. Plaintiff used that average monthly income to project the income received from September 1998 until August 1999. See FTC's Mem. P. & A. S.J. at 44. The estimated grand total from January 1995 until August 1999 is therefore $1,264,-597.02. The defendants do not dispute that figure. We are now in October, and

---

**20.** In order to obtain redress under the FTC Act, the FTC need not show that each consumer for whom redress is sought actually relied on the misrepresentation for which the FTC seeks redress. Reliance is presumed if the FTC shows that "the defendants made material misrepresentations, that they were widely disseminated, and that consumers purchased the defendant's product." FTC v. Figgie Int'l, Inc., 994 F.2d 595, 605–06 (9th Cir.

1993). Here, it is uncontested that the representations made to the consumers were material. It is also uncontested that the representations were widely disseminated. Finally, the FTC only seeks redress for the consumers who actually bought defendants' product. As such, the FTC is entitled to recover the amounts paid by the consumers as a result of the representations.

as such, the Court must adjust the figure to include total income up to the date this order is entered, or another two months. Therefore, the total amount of restitution shall be $1,335,912.14.[21]

## V. CONCLUSION

Because defendants have failed to raise genuine issues of material fact, plaintiff is entitled to a judgment as a matter of law for violations of both the CRO Act and the FTC. As such, the Court GRANTS plaintiff's motion for summary judgment. The Court also finds that this case is a "proper case" for purposes of injunctive relief under the FTC Act.

IT IS THEREFORE ORDERED that Defendants Gill and Murkey, individually and doing business as any other entity, and their agents, servants, employees, attorneys, and all persons or entities directly or indirectly under their control, and those in active concert or participation with them who receive actual notice of the Order by personal service or otherwise, whether acting directly or through any business entity or other device, are hereby permanently restrained and enjoined from participating in the advertising, promoting, offering for sale, sale, performance, or distribution of any credit repair service, including but not limited to sitting on the board of directors of any credit repair organization, including any non-profit organization or any other organization that performs credit repair service.

IT IS FURTHER ORDERED that Defendants Gill and Murkey, individually and doing business as any other entity, and their agents, servants, employees, attorneys, and all persons or entities directly or indirectly under their control, and those in active concert or participation with them who receive actual notice of the Order by personal service or otherwise, whether acting directly or through any business entity or other device, are hereby permanently restrained and enjoined from:

1. Misrepresenting any fact material to a consumer's decision to purchase any credit repair product or service from either Defendant;

2. Representing that either Defendant can substantially improve most consumers' credit reports or profiles by effectuating the permanent lawful removal of bankruptcies, liens, judgments, charge-offs, late payments, foreclosures, repossessions, and other negative information from consumers' credit reports where such information is accurate and not obsolete;

3. Representing that either Defendant will substantially improve any consumer's credit report or profile by effectuating the permanent lawful removal of bankruptcies, liens, judgments, charge-offs, late payments, foreclosures, repossessions, or other negative information from the consumer's credit report where such information is accurate and not obsolete;

4. Inducing, encouraging, or requesting, or assisting or advising any consumer to induce, encourage, or re-

---

**21.** At oral argument, defendants argue that it would be "unfair" for the Court to order such damages against defendants, as "thousands" of their customers are satisfied with their services, and as such have not been injured. Even assuming that defendants do have thousands of satisfied consumers, it does not excuse their violation of the law. "Satisfied" customers are still injured when that satisfaction arises out of the illegal practices of defendants—illegal practices which are conducted in the consumer's name. The CRO Act contemplates as much. Section 1679g states that a consumer can recover "any amount paid by

the person to the credit repair organization" if the credit repair organization failed to comply with any of the provisions of the CRO Act. 15 U.S.C. § 1679g. This provision provides a remedy in the absence of "actual damages" sustained by the consumer as a result of the failure to follow the CRO Act. *Compare id.* § 1679g(a)(1)(A) (allowing consumers to obtain any actual damages sustain as a result of the failure to follow the CRO Act) *with id.* § 1679(a)(1)(B) (allowing consumers, in the alternative, to receive back any amount the consumers have paid to the credit repair organization).

quest, any creditor to report false or misleading information, with respect to any consumer's credit worthiness, credit standing, or credit capacity, to a credit reporting agency;

5. Violating the Credit Repair Organization Act, 15 U.S.C., §§ 1679 to 1679j, as presently enacted or as it may hereinafter be amended, including:

a. Violating 15 U.S.C. § 1679(a)(1) by making any untrue or misleading statement, or counseling or advising any consumer to make any untrue or misleading statement, with respect to any consumer's credit worthiness, credit standing, or credit capacity to any consumer reporting agency as defined in 15 U.S.C. § 1681(f) or to any person who has extended credit to the consumer or to whom the consumer has applied or is applying for an extension of credit; or

b. Violating 15 U.S.C. § 1679(a)(2) by making or using any untrue or misleading statement, or counseling or advising any consumer to make any untrue or misleading statement, the intended effect of which is to alter the consumer's identification to prevent the display of the consumer's credit record, history, or rating for the purpose of concealing adverse information that is accurate and not obsolete.

IT IS FURTHER ORDERED that Defendants Gill and Murkey are hereby permanently restrained and enjoined from:

1. Failing to return within ten days of receipt any payment either Defendant receives for any credit repair service pursuant to any contract or agreement that was entered into prior to March 4, 1998, and to include with each such returned payment a notice to the client stating that as a result of a court order the contracts are rescinded and no further payments are due;

2. Demanding payment or enforcing or threatening to enforce any contract or agreement for the performance of credit repair service entered into prior to March 4, 1998; or

3. Failing to mail notices within ten days after the date this Order is entered, to all credit repair clients, if any, who have payments that are due or may become due on contracts for the performance of credit repair service signed prior to March 4, 1998, stating that as a result of a court order the contracts are rescinded and no further payments are due.

IT IS FURTHER ORDERED that:

1. JUDGMENT is hereby entered against Keith H. Gill and Richard F. Murkey, jointly and severally, and in favor of the Commission in the amount of $1,335,912.14 for equitable monetary relief, including, but not limited to, consumer redress, restitution and/or disgorgement;

2. Any funds received by the Commission pursuant to this Order shall be deposited in an interest bearing account maintained by the Commission, or its designated agent. Said assets shall be either (a) distributed as redress to consumers or (b) paid to the U.S. Treasury, if such distribution is deemed by the Commission in its sole discretion to be impractical. The Commission shall have full and sole discretion to determine the criteria and parameters for participation by injured consumers in a redress program and may delegate any and all task connected with such redress program to any individuals, partnerships, or corporations, and pay the fees, salaries and expenses incurred thereby in carrying out said tasks from the funds received pursuant to this Paragraph, *provided* that such redress plan, and the

fees associated with it, shall be filed with the Court for approval prior to implementation by the FTC or its delegate;

3. No funds paid from any such account shall be returned to Gill or Murkey, and

4. This judgment for equitable monetary relief is solely remedial in nature and is not a fine, penalty, punitive assessment, or forfeiture. In the event of any default on any obligation to make payment under this section, interest, computed pursuant to 28 U.S.C. § 1961(a), shall accrue from the date of default to the date of payment, and shall immediately become due and payable.

IT IS FURTHER ORDERED that the Commission is authorized to monitor the Defendants' compliance with this Order by all lawful means, including but not limited to the following:

1. The Commission is authorized, without further leave of the Court, to obtain discovery from any person in the manner provided by Chapter V of the Federal Rules of Civil Procedure, Fed.R.Civ.P. 26–37, including the use of compulsory process pursuant to Fed.R.Civ.P. 45, for the purpose of monitoring and investigating the Defendants' compliance with any provision of this Order;

2. The Commission is authorized, without further leave of the Court, to use representatives posing as consumers and suppliers to the Defendants, or to employees or independent contractors of any other entity owned, managed, or controlled in whole or in part by either Defendant, without the necessity of identification or prior notice, and

3. Nothing in this Order shall limit the Commission's lawful use of compulsory process, pursuant to Sections 9 and 20 of the FTC Act, 15 U.S.C. §§ 49 and 57b–1, to investigate whether the Defendants have violated any provision of this Order, including Section 5 and 19 of the FTC Act, 15 U.S.C. § 45, 57b, or the CRO Act, 15 U.S.C. § 1679 *et seq.*

IT IS FURTHER ORDERED that, within five (5) business days after the entry of this Order, Defendants Gill and Murkey shall submit to the Commission a truthful statement that shall acknowledge receipt of this Order.

IT IS FURTHER ORDERED that, for purposes of allowing plaintiff to monitor the Defendants' compliance with this Order:

1. For a period of three years from the date of entry of this Order, the Defendants shall notify the Commission of the following:

 a. Any changes in residence, mailing address, and telephone number(s), within ten days of such change; and

 b. Any changes in employment status (including self-employment) within ten days of such change. Such notice shall include the name and address of each business that is affiliated with or employs either Defendant, a statement of the nature of the business, and a statement of the Defendant's duties and responsibilities in connection with the business or employment; and

 c. Any proposed change in the structure of any business entity owned or controlled by either Defendant, in whole or in part, such as creation, incorporation, dissolution, assignment, sale, merger, creation, dissolution of subsidiaries, proposed filing of a bankruptcy petition, or change in the corporate name or address, or any other change that may affect compliance obligations arising out of this Order, thirty days prior to the effective date of any proposed change; Provided that the Commission may not disclose any information

received solely pursuant to Part a of this Paragraph to any person except for law enforcement purposes;

2. One hundred eighty days after the date of entry of this Order, each Defendant shall provide a written report to the Commission, sworn to under penalty of perjury, setting forth in detail the manner and form in which the Defendant has complied and is complying with this Order. This report shall include but not be limited to:

 a. the Defendant's then current residence address and telephone number(s)

 b. the Defendant's then current employment, business addresses and telephone numbers, a description of the business activities of each such employer, and the Defendant's title and responsibilities for each employer;

 c. A statement describing the manner in which the Defendant has complied and is complying with this Order;

3. Upon written request by a representative of the Commission, each Defendant shall submit additional written reports (under oath, if requested) and produce documents on fifteen days' notice with respect to any conduct subject to this Order; and

4. For purposes of this paragraph, "employment" includes the performance of services as an employee, consultant, or independent contractor; and "employers" include any individual or entity for whom the Defendant performs services as an employee, consultant or independent contractor.

5. For purposes of this Order, Defendants shall, unless otherwise directed by the Commission's authorized representative, mail all reports and written notifications required by this Order to Regional Director, Federal Trade Commission, 10877 Wilshire Blvd., Suite 700, Los Angeles, CA 90024.

6. For purposes of the compliance reporting required by this Paragraph, the Commission is authorized to communicate directly with Defendant Gill and Defendant Murkey.

IT IS FURTHER ORDERED that the expiration of any requirements imposed by this Order shall not affect any other obligation arising under this Order.

IT IS FURTHER ORDERED that each party shall bear its own costs and attorneys fees incurred in connection with this action.

IT IS FURTHER ORDERED that this Court shall retain jurisdiction of this matter for all purposes.

IT IS FURTHER ORDERED that entry in the docket of this Order by the Clerk of Court shall constitute notice to the Defendants of the terms and conditions of this Order.

IT IS SO ORDERED.