**FEDERAL TRADE COMMISSION,**
**Plaintiff–Appellee,**

v.

**Keith H. GILL; Richard Murkey,**
**Defendants–Appellants.**

**Nos. 00–55122, 00–55123.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted July 10, 2001

Filed Sept. 12, 2001

---

Keith H. Gill (argued), Woodland Hills, California, for the defendant-appellant in pro per.

Richard Murkey (argued), Woodland Hills, California, for the defendant-appellant in pro per.

Jon Miller Steiger (argued), John F. Daly, and Debra Valentine, Federal Trade Commission, Washington, D.C., for the plaintiff-appellee.

Before: NOONAN, SILVERMAN, and PAEZ, Circuit Judges.

PAEZ, Circuit Judge:

It has been said that bad credit is like a "Scarlet Letter." [1] As Americans' reliance on credit has increased, so-called "credit repair clinics" have emerged, preying on individuals desperate to improve their credit records. These organizations typi-cally promise they can have any negative information removed permanently from any credit report ... for a fee. On September 30, 1996, Congress enacted the Credit Repair Organizations Act ("CRO Act"), 15 U.S.C. §§ 1679–1679j, to ensure that the clinics provide potential customers with the information needed to decide whether to employ the services of such an organization and "to protect the public from unfair or deceptive advertising and business practices by credit repair organizations." 15 U.S.C. § 1679(b).

The Federal Trade Commission ("FTC" or "Commission") filed the instant action for injunctive and other equitable relief on March 2, 1998, against Defendants Keith H. Gill and Richard Murkey for alleged violations of the CRO Act and the Federal Trade Commission Act, 15 U.S.C. § 45(a). Defendants have, since 1995, offered services to remove any type of negative information from consumers' credit reports. Defendants promised a "free consultation," then demanded advance payment for their services.

The district court granted the FTC's motion for summary judgment, permanently enjoined Defendants from participating in the credit repair business, and ordered them to pay $1,335,912.14 as equitable monetary relief (consumer redress, restitution and/or disgorgement). Defendant Murkey raises several arguments on appeal: (1) triable issues of fact exist regarding the alleged false representations and acceptance of payment before services were rendered; (2) the district court abused its discretion in (a) excluding Murkey's exhibits for lack of authentication, (b) denying Murkey's request for a continuance of the summary judgment hearing, and (c) denying Murkey's request for leave

---

1. "A poor credit history is the 'Scarlet Letter' of 20th century America." 136 Cong. Rec. H5325–02 (daily ed. July 23, 1990) (statement of Rep. Annunzio), 1990 WL 103877.

to file a supplemental declaration of his custodian of records; and (3) the district court abused its discretion in permanently enjoining Murkey from engaging in the credit repair business and in ordering him to pay $1,335,912.14 as equitable relief. Defendant Gill similarly maintains that triable issues of fact exist regarding his alleged violations of the CRO Act and the FTC Act. Gill further argues that Murkey was an independent contractor and that Gill should not be held liable for Murkey's actions.

We have jurisdiction under 28 U.S.C. § 1291, and we affirm.

## RELEVANT STATUTES

A. *Fair Credit Reporting Act*

For over thirty years, Congress has sought to balance the need of creditors for accurate credit information with consumers' interests in accuracy and fair use of such data. In 1970, Congress passed the Fair Credit Reporting Act with the express purpose of requiring "consumer reporting agencies [to] adopt reasonable procedures for meeting the needs of commerce for consumer credit, personnel, insurance, and other information in a manner which is fair and equitable to the consumer, with regard to the confidentiality, accuracy, relevancy, and proper utilization of such information in accordance with the requirements of this subchapter." 15 U.S.C. § 1681(b).[2] Consumer reporting agencies ("CRAs") like Trans Union, Experian, and Equifax must exercise care in accurately and completely reporting credit information. 15 U.S.C. §§ 1681c, 1681e. The FCRA limits the length of time that a CRA is permitted to report an adverse item of information. Generally,

bankruptcies may be reported for ten years; all other negative information can remain on a report for up to seven years. 15 U.S.C. § 1681c(a). Older items are referred to as "obsolete."

The FCRA sets forth a procedure for disputing the completeness or accuracy of an item and obtaining a reinvestigation. When a consumer notifies a CRA of a disputed item, that agency has 30 days to "reinvestigate free of charge and record the current status of the disputed information, or delete the item from the file in accordance with paragraph (5), before the end of the 30–day period[.]" 15 U.S.C. § 1681i(a)(1)(A).[3] Upon the creditor's certification that the questioned information is accurate, the CRA can reinsert the information in the consumer's file. 15 U.S.C. § 1681i(a)(5)(A). Although the FCRA does not mandate reinsertion, the CRA's duty to "follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates[ ]" effectively compels this result.

Throughout the 1990s, Congress attempted to address problems resulting from the continued growth of the credit reporting industry. In Senate Report 103–209, concerning the Consumer Reporting Reform Act of 1994, the Committee on Banking, Housing and Urban Affairs noted that the industry "maintains 450 million credit files on individual consumers and processes almost 2 billion pieces of data per month." S. Rep. 103–209, at 2–3 (1993), 1993 WL 516162. As the industry grew, so did the inaccuracies. "From 1990 to 1993, the Federal Trade Commission ... received more complaints regarding

---

2. Unless otherwise indicated, the current version of the particular FCRA provisions is quoted.

3. Paragraph (5) sets forth the requirements for treatment of inaccurate or unverifiable information. The paragraph also provides for reinsertion of a previously deleted item.

consumer reporting agencies than any other industry." *Id.* at 3. Meanwhile, CRAs had ventured into new areas, "creat[ing] and sell[ing] lists of consumers for general direct marketing solicitations not initiated by the consumer and, through a process known as 'prescreening,' sell[ing] more refined lists of credit worthy borrowers for creditors who use the information to extend offers of credit to such borrowers." *Id.*

## B.  *The Credit Repair Organizations Act*

Enter the credit repair clinic.  Congress had recognized the abuses by many of the newly emerging credit repair clinics well before it finally enacted the CRO Act in 1996.  In 1988, Representative Frank Annunzio described these businesses as "kin to 'get rich quick' schemes.  They promise fast results and newfound wealth in the form of available credit."  134 CONG. REC. H6707–06 (daily ed.  August 9, 1988) (statement of Rep. Annunzio), 1988 WL 175220.  The House Report on the Consumer Reporting Reform Act of 1994, the immediate predecessor to the Act passed in 1996, explained further:

> [T]hese credit repair businesses, through advertisements and oral representations, lead consumers to believe that adverse information in their consumer reports can be deleted or modified regardless of its accuracy ... however, accurate, adverse information may be reported for 7 years, or in the case of bankruptcy, 10 years.  Therefore, such representations by credit repair clinics are often misleading ....
>
> Where credit repair clinics do succeed, however, they often do so through abuse of the reinvestigation procedures ... consumer reporting agencies must generally delete information that cannot be verified within 30 days of receiving notice of the dispute.  Credit repair clinics

take advantage of this provision by inundating consumer reporting agencies with so many challenges to consumer reports that the reinvestigation system breaks down, and the adverse, but accurate, information is deleted.

H.R. REP. NO. 103–486 (1994), 1994 WL 164513.  Thus, the CRO Act's express purposes are twofold: "(1) to ensure that prospective buyers of the services of credit repair organizations are provided with the information necessary to make an informed decision regarding the purchase of such services; and (2) to protect the public from unfair or deceptive advertising and business practices by credit repair organizations."  15 U.S.C. § 1679(b).

The CRO Act became effective on April 1, 1997.  Of the prohibited practices listed in the CRO Act, three are involved in the instant appeal:  Sections 1679b(a)(1), 1679b(a)(3), and 1679b(b).  Section 1679b(a)(1) prohibits any person from

> mak[ing] any statement, or counsel[ing] or advis[ing] any consumer to make any statement, which is untrue or misleading (or which, upon the exercise of reasonable care, should be known by the credit repair organization, officer, employee, agent, or other person to be untrue or misleading) with respect to any consumer's credit worthiness [sic], credit standing, or credit capacity to (A) any consumer reporting agency ....

15 U.S.C. § 1679b(a)(1).  Section 1679b(a)(3) prohibits any person from "mak[ing] or us[ing] any untrue or misleading representation of the services of the credit repair organization[.]"  Finally, Section 1679b(b) provides that "[n]o credit repair organization may charge or receive any money or other valuable consideration for the performance of any service which the credit repair organization has agreed to perform for any consumer before such

service is *fully* performed." 15 U.S.C. § 1679b(b) (emphasis added).

A violation of the CRO Act is to be treated as a violation of the FTC Act. 15 U.S.C. § 1679h(b).

### C. *The Federal Trade Commission Act*

Section 5 of the FTC Act, 15 U.S.C. § 45(a)(1), has long prohibited "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce[.]" Section 5(a) empowers the FTC to prevent such acts or practices. 15 U.S.C. § 45(a)(2). An act or practice is deceptive if "first, there is a representation, omission, or practice that, second, is likely to mislead consumers acting reasonably under the circumstances, and third, the representation, omission, or practice is material." *FTC v. Pantron I Corp.*, 33 F.3d 1088, 1095 (9th Cir.1994) (quoting and adopting standard in *Cliffdale Assocs.*, 103 F.T.C. 110, 164–65 (1984)).

### FACTUAL AND PROCEDURAL BACKGROUND

Defendant Keith H. Gill is licensed to practice law in California and works as a sole practitioner as the Law Offices of Keith Gill. In addition to a general legal practice, beginning in 1995, Gill has offered credit repair services to consumers, ostensibly through his law office, but in reality through defendant Richard Murkey. Defendants have used telephones, the U.S. Mail, and radio to advertise their credit repair services to consumers. Under the CRO Act, the Law Offices of Keith Gill qualifies as a "credit repair organization."

Most consumers signed contracts with Gill's law office, and both Gill and Murkey testified that they considered every consumer who signs a retainer agreement with the Gill law office to be Gill's client. Gill testified that his relationship with Murkey is governed by a written contract between the two.

From at least 1995 to 1999, Defendant Richard Murkey operated a credit repair business under the auspices and out of the offices of Defendant Gill's law offices in Woodland Hills, California.[4] Murkey never registered his credit repair business with the State of California or posted a bond, as required by California Civil Code § 1789.12(b)(5), ostensibly because he operated out of Gill's offices (attorneys are exempt from the registration requirement).

To reach potential credit repair clients, Defendants used radio broadcasts, newspaper ads, telephone conversations, and personal meetings throughout the United States. During 1997 and 1998, Murkey appeared regularly on a radio talk program broadcast throughout most of Southern California, discussing credit restoration. The format resembled a talk show, and when Murkey was not available, stations replayed the tapes, rather like a radio infomercial. He told consumers that any sort of negative information, including accurate and not obsolete information, could legally be removed from a consumer's credit report, notably, through the use of Defendants' services. Murkey repeated the telephone and facsimile numbers and encouraged consumers to call for a free credit evaluation or further information. Examples of claims made during the broadcasts include:

> "There literally is nothing a consumer can possibly have on a credit report that

---

4. Until 1990, Murkey practiced law. He resigned from the State Bar of California pending disbarment proceedings, including allegations that he had practiced law while under suspension and had committed multiple acts of misappropriation of client funds.

we cannot remove and we can remove it legally."

"There [are] many legal ways under the Federal Fair Credit Reporting Act to fix credit, no matter what type of negative it is, including foreclosure and or bankruptcy, judgments, tax liens ... even if those [items] are not paid off."

"Because of the Federal laws and the consumers' rights under the Federal laws, we still have legal rights as consumers and we can, in fact, knowing the right proper techniques and strategies and procedures that we have perfected in our offices over the years, we can legally remove those negatives from someone's credit report."

"It doesn't make a difference what type of negative [information] you have: We have files in our offices verifying that we can legally remove bankruptcies, foreclosures, what they call short pays in the real estate community, judgments, tax liens, surrenders, repossessions, defaulted student loans, charge-offs, settlements, collections and even late accounts for child support.... It does not make a difference if that item was legally put on there or not and to us it doesn't make a difference if you still owe money."

"No matter what kind of negative you can possibly have, there are legal ways to take those items off your credit report and that can be done even without you paying off that account. Even tax liens or judgments can be removed from your report legally without you having to pay that charge. It doesn't get you off the liability, however, but it does, in fact, legally remove it from your credit report."

"Most likely, in our offices, we can clean your credit in six weeks to two months."

Beginning in February 1999, Murkey's program was broadcast over Cable Radio Network, which could be heard in, among other places, Rhode Island, Florida, Kentucky, New York, New Jersey, Arizona, Nevada, and possibly Texas.

Murkey and those working for him made similar representations to consumers via telephone. For example, Murkey told an FTC employee: "We can legally remove those bankruptcies and any other accounts that you have and I have files in my offices to verify it." Murkey told another FTC employee: "Under the Federal laws, there are a lot of legal ways to take negative items off someone's credit report. And since it's under Federal law, we can help anyone in the United States." Murkey added: "And we can take off bankruptcies from your credit report. We've got credit reports all over the place showing anything that you possibly can have." One consumer reported that "Murkey ... said that any negative item could be removed from my credit report[.]" Murkey told another consumer that Murkey could "get every negative off the report, including late pays, bankruptcy, the divorce, all of it." [5] Yet another consumer was told he would receive an "improved credit report." When nothing happened, and he called Defendants' offices to complain, the consumer was told again that all the negatives on his reports would be removed "one-by-one."

Murkey's face-to-face representations were no different. Consumers were told that for a nominal fee, based on the number and type of negative items, the negative information would be removed from their credit report in a matter of weeks or

---

5. Murkey also told Frye that he had been an attorney, but said that he had quit because the money was better doing credit repair.

a few months.[6] Defendants deliberately did not ask, however, whether a negative item on a consumer's credit report was accurate or complete.

Murkey generally handled the initial consultation with prospective clients and made the payment arrangements. He explained the manner in which he could assist them in having negative information removed from a credit report, offered to show them results he had obtained for others, and explained the costs for his services. Although no services were performed during the initial "free" consultation, Defendants sought advanced payment of between 25 and 50% of the estimated costs of the services. Defendants generally gave consumers a written estimate based on a "fee schedule," with each negative item listed separately. At that point, Murkey would negotiate the "real" fee. After consumers made the down payment, Defendants billed them on a regular basis, regardless of whether the services had been completed.

In fact, Defendants' "legal" process for "removing" negative information from their clients' credit reports was premised on the obligation of credit reporting agencies ("CRAs") to respond to all consumer disputes within 30 days. 15 U.S.C. § 1681i. As set forth above, CRAs must remove any legitimately challenged item that they cannot verify within the 30 day period. 15 U.S.C. § 1681i(a)(1)(A). If the CRA does verify the item, even after 30 days have passed, it can (and generally will) restore the item to the credit report.

Defendants' credit repair services consisted almost exclusively of inundating the credit reporting agencies with dispute letters, sent in the *consumer's* name, which falsely alleged that various items on the credit report were incorrect or that a particular account did not belong to the consumer. Consumers did not review or approve any of these letters and have stated that they did not authorize Defendants to provide false information to the CRAs. Defendants' letters did generate large volumes of correspondence from CRAs to the clients, however, which created the impression that Defendants were performing as promised. Many of the clients did not discover right away that Defendants' efforts failed to produce the promised results, however, in part because Defendants had instructed their clients to forward these communications directly to Defendants. When the clients learned that their credit report problems had not been resolved, they tried contacting Murkey, who rarely responded. Murkey nevertheless continued to bill the consumers.

Although he was not the one interacting with the clients, Gill had full access to "anything" in Murkey's office and reviewed correspondence with consumers that Murkey sent out. Gill also had the ability to communicate with credit reporting agencies and the right to review any matter related to the credit repair business. In written discovery responses,

---

**6.** Murkey promoted Defendants' credit repair business through public appearances, including presentations to mortgage brokers and a bar association. He told one group of mortgage brokers that "99.9 percent of the time everything we take off stays off forever … we tell our clients this, and we put it in writing, if anything comes back on the credit report at all we'll take it off again for free." He added, "on average of all of our clients, at least half the negatives will be gone in the first six-week period." When a member of the audience asked how realistic it was for a client whose Chapter 7 bankruptcy had been discharged just six months ago to expect to have the bankruptcy removed from the credit report, Murkey responded "it's very realistic." He reassured the audience: "We do this 100 percent legally so your clients can sleep at night and so can I."

moreover, Gill stated that *both* defendants provided credit repair services to clients. After agreeing upon the fee, he responded, the client retained Defendant Gill to perform credit repair services. In response to the interrogatory requesting "the manner in which [Gill] supervise[s] Defendant Murkey and all persons working with Defendant Murkey with respect to the performance of credit repair services[,]" Gill stated:

> *Together*, Gill and Murkey consult with each other as to any credit repair service issues that may arise. *Under Gill's supervision*, Murkey ordinarily handles the day-today credit repair issues. (emphasis added).

Gill also listed just Murkey and himself as the persons "who answered or responded to letters from customers, law enforcement entities, or others complaining to Defendant Murkey or [Gill] about the credit repair services rendered by [Gill] or Defendant Murkey." Although they had no procedure "whereby Mr. Murkey gets a complaint and he has to tell [Gill] about one of your clients is complaining [sic]," Gill testified that they talked several times a week, so Gill was "pretty much aware."

The FTC filed this action against Gill and Murkey on March 2, 1998, in the U.S. District Court for the Central District of California, seeking a permanent injunction and consumer redress. The Commission asserted three claims: (1) violation of the CRO Act by charging clients for services that were not fully performed; (2) violation of the CRO Act by making untrue or misleading statements to induce consumers to purchase their services; and (3) violation of the FTC Act by making untrue or misleading statements to induce consumers to purchase services.

On April 21, 1998, the Defendants each stipulated to preliminary injunctions barring them from representing that "anyone can substantially improve most consumer's credit report or profile by permanently removing bankruptcies, tax liens, late payments, collection accounts, or other evidence of delinquencies from the consumer's credit report where that information is accurate and not obsolete." *FTC v. Gill,* 71 F.Supp.2d 1030, 1034 (C.D.Cal.1999). In addition, they were enjoined from violating the CRO Act by charging or receiving money for credit repair services before the services were fully performed, making statements to credit reporting agencies that they either knew or had reason to believe were untrue or misleading, or making or using any untrue or misleading representation of their services. Defendants were further enjoined from creating, operating, or exercising any control over any form of business entity that provides credit repair services without properly notifying the Commission in writing.

Even after stipulating to the preliminary injunctions, Defendants continued to collect money from clients who had retained them before the complaint was filed. They also created a "nonprofit" organization called "Credit Restoration Corporation of America" ("CRCA"), with Murkey as President and Gill as a director. Through CRCA, Defendants continued, at least into late 1999, to operate their credit repair business. *Id.* at 1047.

The FTC moved for summary judgment on August 30, 1999; the hearing was set for September 20, 1999. On September 2, 1999, Murkey filed an *ex parte* application to continue the hearing. The district court granted the application in part, rescheduling the hearing for October 4 and extending Defendants' response date until September 13. Defendant Murkey applied *ex parte* for an additional extension, which the district court denied.

Murkey filed his opposition with approximately 3,500 pages of unauthenticated ex-

hibits on September 15, 1999, two days late. He filed a declaration on September 17, purporting to authenticate the exhibits. The declarant was Pauline Christie, who had worked for Murkey as the office manager for 14 months. She stated:

> 4. I am familiar with the manner in which Richard Murkey maintains his books and records.
>
> 5. I have examined the documents which have been attached as Exhibits in to [sic] the opposition filed by Richard Murkey to plaintiff's motion for summary judgment.
>
> 7. [sic] I can state of my own knowledge that the documents marked as Exhibits 1 through 8, 34 through 38 and 40 through 57 are true and correct copies of his business records, and that said documents were maintained in the normal course of business.

The Commission objected to Defendant Murkey's exhibits as lacking authentication and as hearsay. The district court agreed and further stated that Defendants failed to offer testimony

> as to what these documents represent or how these documents could possibly show (1) that they achieved any removal of negative information, (2) that any information removed was accurate, (3) that any such information was not obsolete, (4) that any information, if actually deleted, was not later reinserted, or (5) that the permanent removal of that information was achieved in a lawful manner.

*See FTC v. Gill,* 71 F.Supp.2d at 1040.

After hearing argument on October 7, 1999, the district court granted the FTC's motion in its entirety on November 3, 1999. The court entered a permanent injunction prohibiting Defendants from participating in any aspect of the credit repair business, making certain representations to consumers regarding Defendants' credit repair services, reporting false or misleading information to a credit reporting agency, and otherwise violating the CRO Act. *Id.* at 1049–50. The court ordered Defendants to return payments received for any credit repair services performed pursuant to contracts entered before March 4, 1998, notably, for any consumer who did not sign a new retainer agreement following entry of the preliminary injunction. The district court ordered Defendants jointly and severally to pay the sum of $1,335,912.14 to the FTC as equitable monetary relief, including without limitation consumer redress, restitution and/or disgorgement. *Id.* at 1050.

### STANDARD OF REVIEW

■ We review de novo an order granting summary judgment to determine whether, viewing the evidence in the light most favorable to the non-moving party, any genuine issue of material fact exists and whether the district court correctly applied the relevant substantive law. *Balint v. Carson City, Nevada,* 180 F.3d 1047, 1050 (9th Cir.1999) (en banc). Once the FTC has made a prima facie case for summary judgment, the defendant cannot rely on general denials but must demonstrate with evidence that is "significantly probative" or more than "merely colorable" that a genuine issue of material fact exists for trial. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249–50, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), *cited in FTC v. Publishing Clearing House, Inc.,* 104 F.3d 1168, 1170 (9th Cir.1997).

■ We review a district court's evidentiary rulings for an abuse of discretion. *Gilbrook v. City of Westminster,* 177 F.3d 839, 858 (9th Cir.1999); *see also Hagood v. Sonoma County Water Agency,* 81 F.3d 1465, 1479 n. 24 (9th Cir.1996) (hearsay rulings). The decision to grant or deny a

continuance is in the sound discretion of the trial court and will not be overturned except upon a showing of clear abuse. *Citicorp Real Estate, Inc. v. Smith,* 155 F.3d 1097, 1102 (9th Cir.1998).

## DISCUSSION

A. *Genuine Issues of Triable Fact* [Murkey and Gill]

Defendants both maintain that disputes exist regarding their purported false representation and acceptance of payment before rendering services. As the district court found, no such disputes exist.

### 1. *False Representations*

■■■ As a preliminary matter, violation of the CRO Act's prohibition against making or using any untrue or misleading representation of the services of the credit repair organization is not only a violation of the CRO Act, 15 U.S.C. § 1679b(a)(3), but also an unfair or deceptive act or practice in commerce in violation of section 5(a) of the FTC Act, 15 U.S.C. § 45(a). 15 U.S.C. § 1679h(b)(1).[7] As the district court correctly observed, "liability attaches even if the representation made by the credit repair organization is not made 'for the purpose of induc[ing]' consumers to purchase a particular service or good." *FTC v. Gill,* 71 F.Supp.2d at 1038. All the FTC must show to establish violations of both acts, then, is an untrue or misleading statement regarding the services of the CRO.

■■■ Murkey admits making the statements on his radio broadcast(s). He even concedes that "it may have been possible to interpret either defendants' radio broadcast or other representations to mean all negatives can always be removed from all consumers credit reports that was not ever the defendants intent." Although Murkey disputes the district court's conclusions, he offers no evidence to demonstrate that a genuine issue of triable fact exists for trial. He denies certain declarants' statements that they told Murkey that various adverse items on their credit reports were correct. He purports to rely on his own declaration, but the portions of the record to which he cites do not support his contention.[8] Moreover, the district court docket shows that his declaration was never filed in any event.[9] Murkey's unfiled declaration stating that he did not misrepresent Defendants' credit repair services when he stated they could remove all kinds of negatives from consumers' credit reports fails to demonstrate that a genuine issue of material fact exists for trial.

As for Murkey's contention that his declaration establishes that genuine issues exist regarding the FTC declarants' statements that Murkey told them or made it

---

7. That section provides:
   For the purpose of the exercise by the Federal Trade Commission of the Commission's functions and powers under the Federal Trade Commission Act, any violation of any requirement or prohibition imposed under this subchapter with respect to credit repair organizations shall constitute an unfair or deceptive act or practice in commerce in violation of section 5(a) of the Federal Trade Commission Act.

8. Similarly, Murkey states that by saying his success rate was only 99.9%, he gave "a clear signal that it does not happen 100% of the

time." As a result, he argues, he did not represent that he could *permanently* remove negative information from credit reports. *Id.* at 13. We find this argument unpersuasive.

9. Although the declaration included in his Excerpts of Record appears to be the one to which he refers, it bears no "filed" stamp, and the declaration is not in the official court file. The docket does, however, contain an entry to some eight volumes of exhibits Murkey *lodged* on September 15, 1999, but it does not appear that any of these documents were ever filed.

very clear that he would be able to have adverse information deleted from their credit reports permanently, he fares no better. As noted above, his declaration is not part of the record in the case. Even if his self-serving denials sufficed to establish a legitimate dispute, the declaration refers to exhibits that are not part of the record and are not authenticated or explained in any event. In sum, Murkey fails to counter the FTC's substantial showing that he made statements and created an overall "net impression" that he could legally and permanently get negative information removed from consumers' credit reports, even if the information was accurate, complete, and not obsolete. These representations were false and constitute violations of both the CRO Act and the FTC Act.

### 2. *Acceptance of Money*

■ The CRO Act prohibits acceptance of *any* payment before fully performing all services (even assuming Murkey could and did do what he represented he would do). Once again, Murkey cites only his declaration to support his argument that triable issues exist as to whether he accepted payment before fully performing the credit repair services he agreed to provide. He does not dispute that the CRO Act prohibits a CRO from accepting payment for the performance of any service before the service is fully performed. He also does not deny that he did in fact accept a "down payment" after giving the consumer an initial free consultation. Indeed, he stated in his declaration that he "usually ask[s] the consumer for a deposit of 25%" which he believes is "very reasonable." He contends that he "does provide services before the acceptance of any payment," which is beside the point. In sum, we agree with the district court's finding that Murkey violated the CRO Act by accepting payment before he had fully performed the services.

### B. *Procedural Issues* [Murkey]

Defendant Murkey argues that the district court abused its discretion in excluding his exhibits as unauthenticated hearsay and in refusing to allow him to "supplement" the woefully deficient declaration of his "custodian of records." As the FTC suggests,[10] even a perfect declaration from Ms. Christie would not make the documents any more probative. After all, she could not provide the cogent explanation that her employer failed to offer in his declaration. At most, Defendant's evidence, even if admissible, offers snapshots of the credit status of various clients at particular points in time. The "evidence" fails to create a genuine triable issue of material fact regarding Defendants' mis-

**10.** Once again, as Defendant's exhibits are not part of the court record, we have no way to assess one way or the other the FTC's statement that the thousands of pages appear to have been assembled without rhyme or reason. Murkey failed to explain what the documents are supposed to establish, even if they were admissible. The district court noted that Defendants relied on "deletion letters" that purportedly resulted from their negotiations with creditors as evidence that they used other legal methods to remove negative items from consumers' credit reports, not merely illegal methods. Even if the court could determine how the deletion letters came about, that is, as the district court stated, "whether they are the result of negotiations with the creditors, whether they are the result of successful removals of negative items based on inaccuracy, whether they are the result of successful removals of negative items based on the fact that they were obsolete, or whether they are the result of defendants' illegal mailing campaigns[,]" they would not affect the ultimate conclusion. Notably, "[b]ecause at least one of defendants' practices is illegal as a matter of law, their claim that they can remove negative credit information '100% legally' is false." *FTC v. Gill*, 71 F.Supp.2d at 1042.

representations or improper collection of payment for incomplete services.

■ As for the continuance Defendants sought, Murkey argues only that it was "impossible" for him to respond to the FTC's motion even with the extension the district court granted. Murkey concludes, moreover, that no party would have been inconvenienced, that the court would not have been inconvenienced, and that the denial was prejudicial to him. No doubt it was a challenge to respond to the FTC's motion, and the intervening religious holiday counsel cited as a date on which he could not work could weigh in favor of another extension. But nothing in the record suggests that the district court acted arbitrarily or capriciously or otherwise abused its prerogative to control its docket, particularly in light of the district court's denial of the *FTC's* request for a one-week extension to file its reply papers. *Landis v. North American Co.,* 299 U.S. 248, 254, 57 S.Ct. 163, 81 L.Ed. 153 (1936) (court has inherent power to "control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants."); *see also Yong v. INS,* 208 F.3d 1116, 1119 (9th Cir.2000).

C. *Scope of Injunction* [Murkey and Gill]

■ Murkey maintains that the district court abused its discretion in prohibiting him from engaging in the credit repair business and that some lesser restriction would have sufficed in these circumstances. Although inartfully stated, Gill also objects to the scope of the injunction, but on the grounds that he "personally never violated any federal law[,]" and that the district court erroneously attributed to him the acts of a "thirdparty independent contractor." Neither argument has merit.

Defendant Murkey offers no reason why he should be able to continue offering credit repair services. He claims to have ceased advertising in newspapers and on the radio and to have "legally improved the credit reports of over 2500 consumers." The court should enjoin him, at most, "from making any specific representations that it deems to be misleading and to obey all laws in all respects[,]" so that he could "continue to render an invaluable service to the public."

But Murkey had his chance. Although he now claims that the less-restrictive terms of the district court's preliminary injunction should be the terms of the permanent injunction, his violation of those terms undermines the credibility of his argument. The district court found a real likelihood of recurring violation on the basis of: (1) the systematic nature of the misrepresentations, made in weekly radio broadcasts and local newspaper advertisements; (2) Defendants' continued operation of their credit repair business through the "non-profit" organization CRCA; (3) Defendants' ongoing efforts to collect from previous clients under the CRCA, admittedly in violation of the preliminary injunction: (4) Defendants' continued transmission of the same false and misleading letters. As the district court observed, Defendants "have continuously ignored and violated both the CRO Act and the preliminary injunction in this case." *FTC v. Gill,* 71 F.Supp.2d at 1047. We find no basis for disturbing the district court's prudent assessment that giving Defendants another chance might prove to be unwise.

■ As for Defendant Gill's protestations that he was not involved and should not be subject to the permanent injunction (or the equitable monetary relief), he cites no evidence that tends to establish that these "facts" are in genuine dispute. He does state he is "prepared to present evidence at trial," but he never states what the evidence consists of and why he could

not have presented it in his opposition to the FTC's summary judgment motion. Rather, he asserts that Murkey's offices, telephones, and employees were separate and apart from Gill's and that by written agreement, Murkey agreed "to provide certain clerical credit repair services for certain clients of Gill's law firm[.]" Neither Murkey nor Gill was an employee of the other, and they shared no common employees, Gill states. "Murkey at all times retained his independence, similar to an independent probate paralegal service." As Gill committed no wrongful acts of his own, and Gill's liability was premised solely on Murkey's wrongful acts, he maintains the judgment is erroneous.

But Gill was involved from the outset, as his contract with Murkey demonstrated. *He*, not Murkey, "retain[ed] the ultimate responsibility for the quality and sufficiency of the services furnished to [his] clients," although Murkey performed the actual credit repair services for the Gill Law Offices. As discussed above, consumers signed retainer agreements with the *firm*, not with Murkey (which enabled Murkey and Gill to avoid the surety obligation under California law). Gill acknowledged that he spoke with Murkey regularly and elected to sign on the credit repair clients as law firm clients rather than simply refer them to Murkey. He stated that he did not receive any of the fees Murkey collected, but offers no evidence to support his contention.

Even assuming that Gill's law firm was not a sole proprietorship or partnership, the district court nevertheless gave Gill the benefit of the doubt and applied the rigorous standard for corporate liability. Notably, the court applied the test articulated in *FTC v. Publishing Clearing House*, 104 F.3d at 1170, and required the FTC to show: "(1) that the corporation committed misrepresentations or omis-sions of a kind usually relied on by a reasonably prudent person, resulting in consumer injury, and (2) that [Gill] participated directly in the acts or practices or had authority to control them." *Id.* (quoting *FTC v. American Standard Credit Systems, Inc.,* 874 F.Supp. 1080, 1087 (C.D.Cal.1994)). We find no error in the district court's conclusion that the FTC established the first element, and neither Gill nor Murkey have disputed that Gill had the requisite knowledge of the representations. Both defendants are personally liable.

### D. Amount of Equitable Monetary Relief

Defendant Murkey's only complaint about the district court's judgment against him in the amount of $1,335,912.14 is that the district court should have taken into consideration "the thousands of consumers who have benefitted from his services over the years." Murkey cites no authority for this proposition, and none exists.

In fact, as the district court correctly noted, Section 1679g provides for recovery of "any amount paid by the person to the credit repair organization" if the CRO violated any provision of the CRO Act. Moreover, the CRO Act incorporates the FTC's authority under the FTC Act to seek monetary remedies. 15 U.S.C. § 1679h. We have held that restitution is a form of ancillary relief available to the court in these circumstances to effect complete justice. *See FTC v. Pantron I Corp.,* 33 F.3d at 1102. In the absence of proof of "actual damages," the court properly used the amounts consumers paid as the basis for the amount Defendants should be ordered to pay for their wrongdoing. Murkey does not contest the district court's calculation of the amount of equitable monetary relief, and we affirm the judgment.

Finally, for the reasons discussed above, Defendant Gill's contention that he should not be ordered to pay anything because he received nothing does not establish any abuse of discretion on the district court's part. Gill has offered no evidence to support this assertion, and even if he did, his knowledge and de facto control over the conduct of the parties (as the primary signatory to the retainer agreements) supports the district court's decision and judgment in any event. Defendant Gill, like Defendant Murkey, fails to establish a basis for reversing the district court on any of the grounds raised in his appeal.

AFFIRMED.