**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

FEDERAL TRADE COMMISSION,
    *Plaintiff-Appellee,*

v.

CYBERSPACE.COM LLC; FRENCH
DREAMS N.V.; ELECTRONIC
PUBLISHING VENTURES LLC;
OLYMPIC TELECOMMUNICATIONS INC;
IAN EISENBERG,
    *Defendants,*

and

COTO SETTLEMENT; CHRIS HEBARD,
    *Defendants-Appellants.*

No. 04-35428

D.C. No.
CV-00-01806-RSL

---

FEDERAL TRADE COMMISSION,
    *Plaintiff-Appellee,*

v.

CYBERSPACE.COM LLC; COTO
SETTLEMENT; ELECTRONIC
PUBLISHING VENTURES LLC; CHRIS
HEBARD,
    *Defendants,*

and

FRENCH DREAMS N.V.; OLYMPIC
TELECOMMUNICATIONS INC; IAN
EISENBERG,
    *Defendants-Appellants.*

No. 04-35431

D.C. No.
CV-00-01806-RSL

OPINION

7759

Appeal from the United States District Court
for the Western District of Washington
Robert S. Lasnik, District Judge, Presiding

Argued and Submitted
March 7, 2006—Seattle, Washington

Filed July 13, 2006

Before: Diarmuid F. O'Scannlain, Barry G. Silverman,
and Ronald M. Gould, Circuit Judges.

Opinion by Judge O'Scannlain

**COUNSEL**

Roger M. Townsend, Newman & Newman, LLP, Seattle, Washington, argued the cause for appellants Ian Eisenberg, French Dreams, N.V., and Olympic Telecommunications, Inc. Derek A. Newman, Newman & Newman, LLP, Seattle, Washington, was on the briefs.

Ernest Leonard, Friedman & Feiger, LLP, Dallas, Texas, argued the cause for appellants Coto Settlement and Christopher L. Hebard. Lawrence J. Friedman, Friedman & Feiger, LLP, Dallas, Texas, and Sarah K. Johnson and Stacy A. Connole, Foster, Pepper & Shefelman, Seattle, Washington, were on the briefs.

Marilyn E. Kerst, Federal Trade Commission, Washington, D.C. argued the cause for appellees. Willian E. Kovacic, Gen-

eral Counsel, John F. Daly, Deputy General Counsel for Litigation, Collot Guerard, and Michael Goodman, Federal Trade Commission, Washington, D.C., were on the brief.

## OPINION

O'SCANNLAIN, Circuit Judge:

We must decide whether a mail solicitation for internet service is deceptive as a matter of law within the meaning of the Federal Trade Commission Act.

### I

In the late nineties, Ian Eisenberg and Chris Hebard formed Electronic Publishing Ventures, LLC ("EPV") and its four subsidiaries: Cyberspace.com, LLC, Essex Enterprises, LLC, Surfnet Services, LLC, and Splashnet.net, LLC. Two offshore entities, French Dreams Investments, N.V. (owned by Eisenberg) and Coto Settlement (controlled by Hebard) owned EPV in equal parts.

Between January 1999 and mid-2000, EPV's four subsidiaries mailed approximately 4.4 million solicitations offering internet access to individuals and small businesses. The solicitations included a check, usually for $3.50, attached to a form resembling an invoice designed to be detached from the check by tearing at the perforated line. The check was addressed to the recipient and the recipient's phone number appeared on the "re" line. The attached invoice-type form included columns labeled "invoice number," "account number," and "discount taken." The back of the check and invoice contained small-print disclosures revealing that cashing or depositing the check would constitute agreement to pay a monthly fee for internet access, but the front of the check and the invoice contained no such disclosures. Along with the check/invoice doc-

ument, most of the solicitations also included an advertising insert touting the importance of good internet access. The back of the insert explained in small print that a monthly fee would be billed to the customer's local phone bill after the check was cashed or deposited.

At least 225,000 small businesses and individuals cashed or deposited the solicitation checks. The EPV subsidiaries used a billing aggregation service to place charges for $19.95 or $29.95 a month on the small businesses' and individuals' ordinary telephone bills. Internet usage records show, however, that less than one percent of the 225,000 individuals and businesses billed for internet service actually logged on to the service.

Eisenberg and Hebard were aware that the solicitation had misled some consumers. The companies received complaints from recipients of the solicitations which indicated that some customers had deposited the solicitation check without realizing that they had contracted for internet services. Materials that Eisenberg and Hebard prepared in an attempt to sell one of the subsidiaries in 1999 informed prospective buyers that "the Company believes that a number of customers sign up for the [sic] without realizing that when they deposit the check that they have ordered Internet service." In June 2000, after the companies had ceased mailing solicitations to consumers, Cyperspace.com, the largest of the four subsidiaries, commissioned a consumer research study which found that 87.9 percent of 256 participants who actually read the language on the back of the solicitation understood that the act of cashing or depositing the check would constitute agreement to purchase internet service.

Based on its belief that the solicitations were deceptive in violation of Section 5 of the Federal Trade Commission Act ("FTCA"), the Federal Trade Commission ("FTC") sought an injunction and consumer redress in the district court pursuant to FTCA § 13(b). The district court entered two stipulated

permanent injunctions in which the defendants agreed to cease the practices at issue without admitting to a FTCA § 5 violation. The parties then filed cross-motions for summary judgment on the issues of liability and consumer redress.

After denying the defendants' motions for summary judgment, the district court granted the FTC's motion in part. The court concluded that the solicitation violated FTCA § 5 as a matter of law. The district court further concluded that Ian Eisenberg was liable for the § 5 violation in his individual capacity as a matter of law. The district court then held a one-day bench trial on consumer redress in which it concluded that the proper amount of consumer redress was $17,676,897.

The Eisenberg defendants—Ian Eisenberg, French Dreams Investments, N.V., and Olympic Telecommunications, Inc., a billing aggregator owned by Eisenberg (collectively, "EFO") —and the Hebard defendants—Chris Hebard and Coto Settlement (collectively, "Hebard")—filed timely separate appeals, which we consolidated for review.[1]

## II

**[1]** Section 5 of the Federal Trade Commission Act prohibits "deceptive acts or practices in or affecting commerce." FTCA § 5(a)(1), 15 U.S.C. § 45(a). As we have previously explained, a practice falls within this prohibition (1) if it is likely to mislead consumers acting reasonably under the circumstances (2) in a way that is material.[2] *FTC v. Gill*, 265 F.3d 944, 950 (9th Cir. 2001) (citing *FTC v. Pantron I Corp.*, 33 F.3d 1088, 1095 (9th Cir. 1994)).

---

[1]We review the district court's order granting summary judgment *de novo*. *Balint v. Carson City, Nevada,* 180 F.3d 1047, 1050 (9th Cir. 1999).

[2]Hebard and EFO would have us add an additional requirement: that the FTC must prove that consumers could not reasonably have avoided injury. However, the plain language of the provision that Hebard and EFO cite for this contention, FTCA § 5(n), defeats this argument.

A

**[2]** In this case, Hebard and EFO contend that the fine print notices they placed on the reverse side of the check, invoice, and marketing insert preclude liability under FTCA § 5. We disagree. A solicitation may be likely to mislead by virtue of the net impression it creates even though the solicitation also contains truthful disclosures. In *Floersheim v. FTC*, 411 F.2d 874 (9th Cir. 1969), we found that substantial evidence supported the FTC's determination that the appearance and prominent repetition of the words "Washington D.C." on debt-collecting forms from a private collections company created the deceptive impression that the forms were a demand from the government even though the forms contained a small print disclaimer informing recipients that such was not the case. *Id.* at 876-78. Similarly, in *Independent Directory Corp. v. FTC*, 188 F.2d 468 (2d Cir. 1951), the Second Circuit held that substantial evidence supported the FTC's determination that a solicitation for advertising orders that appeared to be a renewal notice for an existing advertisement was deceptive even though the fine print disclosed that the advertisement clipping attached to the form was an advertisement the recipient had taken out in a different publication.[3] *Id.* at 470.

Likewise, in *FTC v. Brown & Williamson Tobacco Corp.*, 778 F.2d 35, 42-43 (D.C. Cir. 1985), the D.C. Circuit affirmed a district court's finding that an advertisement's description of cigarette tar content was deceptive even though fine print in the corner of the advertisement truthfully explained how the tar content was measured. The court reasoned that, under the circumstances, consumers were unlikely

---

[3]We acknowledge that in *Floersheim* and *Independent Directory Corp.*, we and the Second Circuit were applying the more deferential "substantial evidence" standard because these cases involved review not of a district court's summary judgment determination, but instead a completed agency proceeding. However, owing to the paucity of cases involving *de novo* district court proceedings under FTCA § 5, we look to these cases for guidance as to the standard for deception.

to read the fine print in the corner of the ad. *Id*. at 43; *see also Standard Oil Co. of California v. FTC*, 577 F.2d 653, 659 (9th Cir. 1978) (affirming for substantial evidence the FTC's finding that the predominant visual message of an advertisement was misleading, and that it was not corrected by the accompanying verbal message in the advertisements); *cf. FTC v. Figgie Int'l., Inc*., 994 F.2d 595, 604 (9th Cir. 1993) ("Figgie can point to nothing in statute or case law which protects from liability those who merely imply their deceptive claims; there is no such loophole."); *Sterling Drug, Inc. v. FTC*, 741 F.2d 1146, 1152, 1154 (9th Cir. 1984) ("A determination of false advertising can be based upon deceptive visual representations."); *Am. Home Prods. Corp. v. FTC*, 695 F.2d 681, 687 (3d Cir. 1982) (" '[T]he tendency of the advertising to deceive must be judged by viewing it as a whole' . . . . The impression created by the advertising, not its literal truth or falsity, is the desideratum.") (quoting *Beneficial Corp. v. FTC*, 542 F.2d 611, 617 (3d Cir. 1976)).

**[3]** Here, Hebard and EFO's mailing created the deceptive impression that the $3.50 check was simply a refund or rebate rather than an offer for services. The check was made out to the individual or small business to whom it was sent, with the consumer's phone number in the "re" line. The portion of the document that resembled an invoice included columns labeled "invoice number," "account number," and "discount taken," implying a preexisting business relationship for which a refund check was being offered. The front of the check and invoice lacked any indication that by cashing the check, the consumer was contracting to pay a monthly fee. As the district court reasoned, "[t]he receipt of a check, the perusal of which would reveal no obvious mention of an offer for services, no product information, and no indication that a contract is in the offing, coupled with an invoice that has no advertising or solicitation purpose, creates an overall impression that the check resolves some small, outstanding debt." *FTC v. Cyberspace.com*, *LLC*, No. C00-1806L, 2002 WL 32060289, *2 (W.D. Wash. 2002). Based on the foregoing,

we agree with the district court that no reasonable factfinder could conclude that the solicitation was not likely to deceive consumers acting reasonably under the circumstances.

**[4]** Our conclusion is bolstered by undisputed evidence indicating that Hebard and EFO's solicitation actually deceived nearly 225,000 individuals and small businesses. Hebard and EFO billed each of these consumers for a service that less than one percent of them ever attempted to use. It is reasonable to infer that most of the remaining 99 percent did not realize they had contracted for internet service when they cashed or deposited the solicitation check. Although "[p]roof of actual deception is unnecessary to establish a violation of Section 5," *Trans World Accounts, Inc. v. FTC*, 594 F.2d 212, 214 (9th Cir. 1979), such proof is highly probative to show that a practice is likely to mislead consumers acting reasonably under the circumstances. We cannot accept Hebard's and EFO's contention that the nearly 225,000 consumers billed for unwanted internet service acted unreasonably when they cashed or deposited the solicitation check.

**[5]** We further conclude that the solicitation was likely to mislead in a way that is material. A misleading impression created by a solicitation is material if it "involves information that is important to consumers and, hence, likely to affect their choice of, or conduct regarding, a product." *Cliffdale Associates, Inc.*, 103 F.T.C. 110, 165 (1984). Here, the misleading impression the solicitation created — that the check was merely a refund or rebate — clearly made it more likely that consumers would deposit the check and thereby obligate themselves to pay a monthly charge for internet service.

**[6]** In sum, the district court properly granted summary judgment to the FTC on the FTCA § 5 violation because no reasonable factfinder could conclude that the solicitation was not likely to mislead consumers acting reasonably under the circumstances in a way that is material. *Gill*, 265 F.3d at 950.

B

**[7]** The results of the consumer research study Cyberspace.com commissioned do not undermine our conclusion. As EFO's counsel conceded at oral argument, the survey results stand only for the proposition that most consumers can understand the fine print on the back of the solicitation when that language is specifically brought to their attention. Importantly, the survey did not probe whether the notices were sufficiently conspicuous to draw the survey subjects' attention in the first place.

Similarly, the fact that the companies provided consumers a toll free number to call for refunds does not affect our conclusion that the solicitation violated FTCA § 5. *See Pantron*, 33 F.3d at 1103 ("the existence of a money-back guarantee is insufficient reason as a matter of law to preclude a monetary remedy [for a § 5 violation]").

III

**[8]** We next address Eisenberg's contention that the district court erred by finding, as a matter of law, that he is liable in his individual capacity. An individual is personally liable for a corporation's FTCA § 5 violations if he "participated directly in the acts or practices or had authority to control them" and " 'had actual knowledge of material misrepresentations, was recklessly indifferent to the truth or falsity of a misrepresentation, or had an awareness of a high probability of fraud along with an intentional avoidance of the truth.' " *FTC v. Publishing Clearing House, Inc.*, 104 F.3d 1168, 1170-71 (9th Cir. 1997) (quoting *FTC v. Am. Standard Credit Sys.*, 874 F. Supp. 1080, 1089 (C.D. Cal. 1994)).

**[9]** Eisenberg admits that the district court correctly found that he "had and exercised control over all of the corporate entities except Coto Settlement." *Cyberspace.com*, No. C00-1806L, 2002 WL 32060289, at *5. He contends, however,

that the district court erred by concluding that he had sufficient knowledge to be personally liable. We disagree. The undisputed evidence demonstrates that Eisenberg reviewed at least some of the solicitation checks before they were mailed, and that Don Reese, the billing manager for defendant-appellant Olympic Telecommunications, Inc., had numerous conversations with Eisenberg about consumer complaints in which Reese told Eisenberg that "there were a lot of customers who didn't know they were customers [because] AR [accounts receivable] did not know what that check represented." This undisputed evidence is sufficient, as a matter of law, to demonstrate that Eisenberg knew the facts constituting the § 5 violation or at the very least was recklessly indifferent to the truth. *See Publishing Clearing House*, 104 F.3d at 1171.

Eisenberg's attempt to avoid liability based on his contention that he had a "reasonable basis" to believe that the solicitation checks did not violate the FTCA is unavailing.[4] "[R]eliance on advice of counsel [is] not a valid defense on the question of knowledge" required for individual liability. *FTC v. Amy Travel Serv., Inc.*, 875 F.2d 564, 575 (7th Cir. 1989); *see also Feil v. FTC*, 285 F.2d 879, 896 (9th Cir. 1960) (whether an individual acts in good or bad faith is immaterial to liability under FTCA § 5).

## AFFIRMED.[5]

---

[4]Relying solely on his own affidavit, Eisenberg claims that he relied on the consumer research study to support his view that the mailings were not deceptive. This argument is implausible because Cyberspace.com did not commission the study until June 2000, after the companies sent out their final mailing on March 15, 2000. Eisenberg also relies solely on his own affidavit to claim that Hebard assured him that the solicitation checks had been approved by an attorney retained by Cyberspace.com.

[5]We address Hebard and EFO's remaining claims in a memorandum disposition filed currently with this opinion. We decline to reach Hebard's claim that the district court used an improper measure to calculate consumer redress because Hebard raised this claim for the first time in his 28(j) letter to this court. *See Pawlyk v. Wood*, 248 F.3d 815, 822 n.5 (9th Cir. 2001) (holding that an attempt to raise an issue "by submitting a supplemental citation, pursuant to Federal Rule of Appellate Procedure 28(j) . . . is too late; the issue is waived").