FILED

NOT FOR PUBLICATION

MAY 27 2010

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

| | |
|---|---|
| PHILLIP RANNIS, | No. 09-55859 |
| Plaintiff-Appellee, | D.C. No. 5:06-cv-00373-AG-JC |
| v. | |
| PETER L. RECCHIA, | MEMORANDUM[*] |
| Defendant-Appellant. | |

Appeal from the United States District Court
for the Central District of California
Andrew J. Guilford, District Judge, Presiding

Argued and Submitted May 7, 2010
Pasadena, California

Before: B. FLETCHER and PAEZ, Circuit Judges, and KORMAN, District Judge.[**]

Peter L. Recchia, an attorney licensed to practice law in California, appeals

from a judgment of the district court granting final approval of a class settlement from

a lawsuit which, *inter alia*, alleged violations of the Credit Repair Organizations Act

---

[*]     This disposition is not appropriate for publication and is not precedent except as provided by 9th Cir. R. 36-3.

[**]     The Honorable Edward R. Korman, Senior United States District Judge, Eastern District of New York, sitting by designation.

1

("CROA"), 15 U.S.C. §§ 1679–1679j. Recchia also appeals from "all interlocutory orders that gave rise to the judgment." The settlement agreement reserved Recchia's right to appeal the issues he raises.

Recchia represented clients on a variety of issues relating to consumer protection and unfair debt collection under the firm name Fair Credit Lawyers, Inc. Relevant here, Recchia offered a non-litigation "credit resolution program," in which he charged clients $499 to $599 for his services purportedly achieving a "maximally accurate" and "positive" credit report. To solicit clients, Recchia placed advertisements in the *PennySaver* circulated in several counties in Southern California which read in part, "Improve Your Credit Score Now!"

After viewing the PennySaver advertisement, Phillip Rannis contacted and ultimately retained Recchia to resolve his credit/debt collector issues. In December 2003, Rannis entered into a standard retainer agreement with Recchia. The contract specified that Rannis would pay $499 for Recchia's services and required payment prior to Recchia's performance of those services. Rannis paid at least $474 before Recchia completed services on his behalf.

On April 6, 2006, Rannis filed a complaint against Recchia in the United States District Court for the Central District of California on behalf of himself and other individuals who had entered into contracts with Recchia for credit repair services

during or after December 2002. The complaint claimed, *inter alia*, that Recchia had violated the CROA by accepting payment in advance of services and by failing to provide required disclosures. The district court granted Rannis's motion for class certification under Federal Rule of Civil Procedure 23(b)(3). The class included 74 potential members.

Subsequently, the district court, ruling on cross-motions for summary judgment, granted Rannis's motion for partial summary judgment, holding that Recchia had violated the CROA. The parties then reached a settlement in which Recchia agreed to pay $600 to each class member and $5,000 to Rannis, the class representative. Recchia reserved the right to appeal the district court's determination of liability and attorneys' fees but explicitly waived the right to appeal damages.

On appeal, Recchia challenges the district court's determination of liability under the CROA. Recchia also argues that the district court should have granted his motion to decertify the class on numerosity grounds and that the court should not have granted final approval of the settlement agreement. We reject all of these arguments.

I.

The CROA defines a "credit repair organization" as "any person who uses any instrumentality of interstate commerce or the mails to sell, provide, or perform (or represent that such person can or will sell, provide, or perform) any service, in return

3

for the payment of money or other valuable consideration, for the express or implied purpose of . . . improving any consumer's credit record, credit history, or credit rating." 15 U.S.C. § 1679a(3)(A).

Recchia meets these requirements. Specifically, he admits that he used interstate commerce and the mail in providing credit resolution services and that he provided those services in exchange for valuable consideration. Although Recchia argues that he did not provide those services for the express or implied purpose of "improving" clients' credit reports, the record evidence confirms that he did. In addition to the advertisement in the PennySaver soliciting clients, which explicitly advertised "Improve Your Credit Score Now!", Recchia had clients sign retainer agreements with his firm expressly stating that his goal was to "achiev[e] a maximally accurate and positive credit report on Client's behalf." The documents accompanying the contract also indicated his purpose of improving clients' credit reports. The "Welcome" document that detailed fees and explained the steps a client should follow read, "This package contains the beginning of what you need to be on the road to a *maximally accurate* credit report and *improved* credit score!" (emphasis added.) Likewise, the "Welcome" document that accompanied a packet of information on Fair Credit Lawyers advised that "[t]he information contained herein explains what we can do to result in your credit reports being maximally accurate and put you on the road to

4

a *totally positive credit report. . . . By choosing Fair Credit Lawyers you will receive positive results and positive credit reports for a very reasonable fee*" (emphasis added).

Nevertheless, Recchia argues that he was not acting as a credit repair organization because the CROA exempts attorneys acting in the course and scope of the practice of law. We rejected a similar argument in *FTC v. Gill*, 265 F.3d 944, 950 (9th Cir. 2001). In *Gill*, an attorney licensed to practice law in California "offered credit repair services to consumers, ostensibly through his law office, but in reality through" his co-defendant who operated a credit repair business. *Id.* The defendants attempted to remove all negative information from consumers' credit reports, regardless of its accuracy, and did so "almost exclusively" by "inundating" credit reporting agencies with letters that falsely alleged that various items on credit reports were incorrect. *Id.* at 952.

While the defendants in *Gill* acted in a fraudulent and deceptive fashion, whereas Recchia claims he aimed only to correct inaccuracies, this distinction does not undermine *Gill*'s applicability. As we held in *Gill*, attorneys are credit repair organizations if they qualify under the CROA. *See id.* at 950. Under the definition provided in 15 U.S.C. § 1679a(3)(A), Recchia qualifies as a "credit repair organization" so long as he acted for the purpose of "improving any consumer's credit

record, credit history, or credit rating." Although an important purpose of the CROA is "to protect the public from unfair and deceptive advertising and business practices by credit repair organizations," 15 U.S.C. § 1679(b)(2), and certain provisions in 15 U.S.C. § 1679b(a) specifically require a deceitful or misleading intent, one need not engage in fraud either to qualify as a credit repair organization or to violate other provisions of the statute.

Because Recchia met the definition of a credit repair organization, he was required to comply with the CROA, including its provisions prohibiting charging clients before fully performing services, *see* 15 U.S.C. § 1679b(b), and mandating certain disclosures prior to contracting with clients for the credit resolution services he offered, *see* 15 U.S.C. §§ 1679c–1679e. Recchia violated the CROA by failing to comply with these provisions.

## II.

In rejecting Recchia's motion to decertify the class, the district court evaluated the appropriate size of the plaintiff class and determined that, in addition to the 13 members who received notice and did not opt out, the class should include the seven members whose notice was returned as undeliverable and never remailed because those members received "the best notice practicable under the circumstances." We review *de novo* whether the notice afforded to those seven members satisfies the

6

demands of due process. Because we conclude that it does, those members can be included in the class.

The notice provided to a class certified under Rule 23(b)(3) must satisfy Rule Rule 23(c)(2), which requires "the best notice that is practicable under the circumstances." Fed. R. Civ. P. 23(c)(2)(B). These requirements are designed to ensure that class notice procedures comply with the demands of due process. *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 173 (1974).

Best practicable notice requires individual notice "to all class members whose names and addresses may be ascertained through reasonable effort." *Id.* Nevertheless, it does not necessarily require that every in-state class member "actually receive[]" notice.[1] *Silber v. Mabon*, 18 F.3d 1449, 1453–54 (9th Cir. 1994). That is, due process requires reasonable effort to inform affected class members through individual notice, not receipt of individual notice.

In this case, the Class Administrator, CPT, sent the seven members whose notice was returned and never remailed fully descriptive notice by first-class mail to the addresses last known to Recchia. In addition, CPT performed skip trace searches on each member whose notice was returned as undeliverable in an effort to locate better addresses. These measures demonstrate a "reasonable effort" to ascertain the

---

[1] We do not address the notice requirements when a class action includes out-of-state plaintiffs who lack even minimum contacts with the forum state.

addresses of and send notice to the seven members at issue here. Accordingly, those members received the "best notice that is practicable under the circumstances," Fed. R. Civ. P. 23(c)(2)(B), and are properly included in the class.

The district court likewise did not abuse its discretion in determining that the class of 20 satisfies the numerosity requirement. To satisfy the numerosity requirement under Rule 23(a), a proposed class must be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a). Joinder need not be impossible, as long as potential class members would suffer a strong litigation hardship or inconvenience if joinder were required. *Harris v. Palm Springs Alpine Estates, Inc.*, 329 F.2d 909, 913–14 (9th Cir. 1964).

The numerosity requirement is not tied to any fixed numerical threshold—it "requires examination of the specific facts of each case and imposes no absolute limitations." *Gen. Tel. Co. of the Nw., Inc. v. EEOC*, 446 U.S. 318, 330 (1980) (citing cases). Nevertheless, precedent provides some guidance. In general, courts find the numerosity requirement satisfied when a class includes at least 40 members. *EEOC v. Kovacevich "5" Farms*, No. CV-F-06-165, 2007 WL 1174444, at *21 (E.D. Cal Apr. 19, 2007). On the low end, the Supreme Court has indicated that a class of 15 "would be too small to meet the numerosity requirement." *Gen. Tel. Co.*, 446 U.S. at 330. The Court based this assessment on a review of lower court cases in which

8

certification was denied to classes in the 16 to 37 range. *See id.* at 330 & n.14. In light of this trend, the Court concluded that a trial court would almost certainly require joinder of all class members rather than certify a class of 15. *See id.* at 330. Relying on this holding, we have declined to uphold classes of seven, nine, and ten members. *See Harik v. Cal. Teachers Ass'n*, 326 F.3d 1042, 1051 (9th Cir. 2003) ("The Supreme Court has held fifteen is too small. The certification of those classes must be vacated on numerosity grounds.").

Although the 20-member class in this case could be considered "a jurisprudential rarity," *Estate of Felts v. Genworth Life Ins. Co.*, 250 F.R.D. 512, 520 (W.D. Wash. 2008), the small class size does not preclude a finding that the numerosity requirement is met. The Supreme Court's analysis in *General Telephone Co.* questioned the likelihood that a district court would certify a class of this size—it did not undermine a district court's discretion to do so. *See* 446 U.S. at 330 & n.14. Other circuits have upheld class certifications of 20 and even 18. *See, e.g.*, *Ark. Educ. Ass'n v. Bd. of Educ.*, 446 F.2d 763, 765–66 (8th Cir. 1971) (upholding class of 20); *Cypress v. Newport News Gen. & Nonsectarian Hosp. Ass'n*, 375 F.2d 648, 653 (4th Cir. 1967) (upholding class of 18).

In this case, the district court determined that the numerosity requirement was met because, "[g]iven the circumstances of this case, . . . joinder of individual class

9

members would be impracticable." Specifically, the district judge found that considerations of judicial economy weighed in favor of maintaining the class mechanism because decertification would likely be "inefficient," potentially clogging the court's docket with many separate lawsuits, as well as "costly," imposing unnecessary financial burdens on class members whose damages likely would not exceed $600. Moreover, decertification could confuse those class members who had already been notified of the settlement award.

District courts have broad leeway in making certification decisions. Recchia has not persuaded us that the district court's decision was a clear abuse of discretion. *See In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 461 (9th Cir. 2000).

Moreover, we observe that Recchia aggressively urged at least one class member to opt out. An employee of Recchia called this class member, informing him that he would be receiving class notice and urging him to opt out—even specifying the wording he should use on the opt-out form. Recchia himself afterward tried to contact the class member twice, purportedly about litigation that had already settled months before, as well as about what Recchia described as "the other matter." Thereafter, the class member was contacted yet again, this time by a former employee of Recchia who also insisted that the class member opt out.

The record is silent with respect to others who opted out, at least in part because

the district court denied Rannis's motion to investigate the 31 class members who received notice but opted out. Nevertheless, Recchia's actions may account for the fact that the overwhelming majority of potential members who received notice took the time to mail in opt out forms to decline a $600 refund when their recovery from an individual suit was unlikely to exceed the $499 to $599 they paid for credit repair services. Under all these circumstances, the reduction from 74 to 20 class members did not compel the district court to decertify the class. *Cf. Ark. Educ. Ass'n*, 446 F.2d at 765–66.

III.

Recchia argues that the district court erred in approving the settlement agreement because the agreement provides Recchia with the right to appeal liability issues and is thus "not conclusive, negating any benefits the Class members expect to receive, by putting the settlement on hold, indefinitely, pending the appeal." Although Recchia reserved the right to appeal the issues of "liability, attorney's fees, and costs," the settlement provided benefit to the plaintiff class because Recchia explicitly waived the right to appeal the issue of damages. The district court acknowledged this benefit in the judgment following final approval of the settlement, in which it found that the terms of the settlement agreement were "particularly fair, adequate, and reasonable" to Rannis and all class members "in light of the risk of establishing liability and

11

damages, and the expense of further litigation."

Significantly, the district judge was in a superior position to gauge whether the terms of the settlement are "fair, reasonable, and adequate" under Rule 23(e) because he had the opportunity to observe the parties throughout the settlement process and was familiar with their concerns, priorities, and intentions. Indeed, by the time of the final fairness proceeding, the district court had already "dealt with a lot of the issues before." In sum, the district court did not abuse its discretion in granting final approval of the class settlement.

## CONCLUSION

The judgment of the district court is **AFFIRMED**.